Filed 5/20/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MEGA RV CORPORATION,<br><br>   Cross-complainant, Cross-defendant and Appellant,<br><br>      v.<br><br>HWH CORPORATION,<br><br>   Cross-defendant, Cross-complainant and Respondent. | G047718<br><br>(Super. Ct. No. 30-2007-00100242)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on April 30, 2014, be modified as follows:

On page 26, line 8, before the sentence beginning with "We are unaware of any . . . ." insert the following:

Like *Sooy v. Peter*, *supra*, 220 Cal.App.3d at pages 1311-1312, we disagree with the majority opinion in *Manning v. Sifford* (1980) 111 Cal.App.3d 7, 10-11, wherein the court suggested it could award tort of another damages even if no tort duty existed.

The petition for rehearing is DENIED.

There is no change in the judgment.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.

Filed 4/30/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MEGA RV CORPORATION, | |
| Cross-complainant, Cross-defendant and Appellant, | G047718 |
| v. | (Super. Ct. No. 30-2007-00100242) |
| HWH CORPORATION, | O P I N I O N |
| Cross-defendant, Cross-complainant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Jamoa A. Moberly, Judge. Affirmed as modified.

Adam K. Obeid for Cross-complainant, Cross-defendant and Appellant.

David B. Dimitruk for Cross-defendant, Cross-complainant and Respondent.

This case began with a prosaic dispute.  John and Dawn Ertz (collectively the Ertzes) purchased a motor home from retailer Mega RV Corporation (Mega RV). Citing alleged defects in the motor home, the Ertzes sued Mega RV, Country Coach, L.L.C. (Country Coach; the manufacturer of the motor home), and Bank of America, N.A. (Bank of America; the financier of the transaction) under the Song-Beverly Consumer Warranty Act (the Act; Civ. Code, § 1790 et seq.).[1]  Mega RV seemingly had little to fear.  According to Mega RV's appellate brief, "Country Coach was providing Mega RV with defense and indemnity in this case pursuant to contract and statute."

Unfortunately for all parties to this case, an involuntary bankruptcy petition was filed against Country Coach in 2009.  Suddenly, Mega RV faced the prospect of paying for its own defense and for any award of damages and attorney fees obtained by the Ertzes under the Act.  (See § 1794.)

Mega RV devised a clever response to its predicament.  Citing section 1792, which states in relevant part that "[t]he retail seller shall have a right of indemnity against the manufacturer in the amount of any liability under this section," Mega RV posited that component part manufacturers (not just the ultimate manufacturer of the final consumer good) are subject to liability and indemnity obligations under the Act.  HWH Corporation (HWH) manufactured hydraulic components incorporated by Country Coach into the motor home ultimately sold to the Ertzes by Mega RV.  Mega RV filed a cross-complaint against HWH, seeking total or partial indemnification from HWH under the Act.

But Mega RV's stratagem backfired.  The trial court concluded HWH was not required to indemnify Mega RV under the Act for any relief obtained by the Ertzes. Moreover, ruling on HWH's cross-complaint, the court awarded $166,000 in damages to

---

[1]     All statutory references are to the Civil Code unless otherwise stated.

HWH and against Mega RV, reasoning that the "tort of another" doctrine justified this departure from the typical rule that a party pays its own attorney fees.

We agree with the portion of the judgment declaring that Mega RV is not entitled to indemnity from HWH. As we shall explain, a component part manufacturer is only subject to section 1792 obligations if it has provided an express warranty to the consumer pertaining to the component part at issue. But we disagree with the court's application of the tort of another doctrine. We therefore strike the award of damages to HWH and affirm the judgment as modified.

FACTS

*Pre-trial Procedural History*

The Ertzes' initial complaint was filed in December 2007; a first amended complaint was filed in October 2008. Both complaints featured causes of action under the Act and alternative causes of action under the California Uniform Commercial Code. The only difference between the two complaints was the addition of Bank of America as a defendant in the first amended complaint, alongside Country Coach and Mega RV.

An involuntary bankruptcy petition was filed against Country Coach in 2009. Mega RV moved to compel the joinder of HWH as a defendant in June 2010. The court granted the motion, thereby compelling plaintiffs (the Ertzes) to name HWH as a defendant. HWH was named as a defendant in the Ertzes' December 2010 second amended complaint.

Mega RV's August 2010 cross-complaint sought indemnity from HWH as well as declaratory relief. The key paragraph in Mega RV's cross-complaint alleged as follows: The motor home "was designed and manufactured by Country Coach, integrating hydraulic systems and hydraulic parts . . . designed and manufactured by HWH. Specifically, the hydraulic system, hydraulic lines, and hydraulic parts that

5

comprise the mechanisms that move the [motor home's] slide outs were manufactured and supplied by HWH. *Moreover, HWH provided an express warranty . . . for each of the hydraulic systems, hydraulic lines and hydraulic parts that it manufactured* and which were integrated into the design and manufacture of the [motor home]." (Italics added.) Mega RV alleged it was entitled to indemnity under section 1792 based on an alleged breach of the implied warranty of merchantability by HWH.

In its cross-complaint for declaratory relief and equitable indemnity, HWH contended the Act did not apply to it for several reasons, among which was the following allegation: The Act "does not apply to HWH because HWH did not issue an express warranty . . . to Country Coach, the Ertzes or Mega RV." As part of its equitable indemnity cause of action, HWH alleged that cross-defendants (including Mega RV and the Ertzes) "were negligent in the way they either designed or manufactured the motor home or its component parts, diagnosed the causes and conditions in the motor home, and effectuated and failed to effectuate repairs to the motor home. . . . [S]uch negligence (1) caused the Ertz[es] damages, if any, (2) also caused the conditions in the motor home to not be repaired on which the Ertz[es] base their lawsuit against Mega RV, and (3) impaired HWH's rights to effectuate repairs, if it was required to do so at all, and avoid the costs of this lawsuit."

In June 2011, HWH and the Ertzes entered into a settlement agreement. Pursuant to the settlement agreement, the *Ertzes paid* HWH $2,000 and dismissed HWH from the lawsuit with prejudice in exchange for a release of all claims by HWH. As recited in the settlement agreement, the Ertzes "independently determined to their own satisfaction that HWH . . . did not cause or contribute to causing the hydraulic leaks that . . . the Motor Home [is alleged to have] sustained." The court denied HWH's Code of Civil Procedure section 877.6 motion for an order determining the settlement was in good faith.

Just before trial was set to begin, the Ertzes, Mega RV, and Bank of America agreed to submit the matter to binding arbitration. The court stayed Mega RV's cross-complaint against HWH. But HWH opposed a stay of the trial on its cross-complaint. The court allowed HWH's cross-complaint to proceed to a separate trial (even though it was premised on indemnity and declaratory relief issues that only needed to be decided if the Ertzes established the liability of Mega RV in the first place).[2]

*Evidence at Trial*

HWH is located in Iowa. HWH does not manufacture motor homes. HWH manufactures component parts and supplies those parts (primarily "leveling systems and slide-out mechanisms") to manufacturers of motor homes (and other vehicles). HWH does not manufacture every part used in its slide-out hydraulic systems. For instance, HWH purchases hoses from Eaton Corporation and Parker Hannifin Corporation. HWH has sold components to Country Coach for more than 20 years. Country Coach placed purchase orders and HWH shipped the components from Iowa to Country Coach in Oregon by common carrier. HWH did not provide engineering services to Country Coach regarding the construction of its motor homes.

At all relevant times, Mega RV was an authorized Country Coach warranty repair and service center, but was not an authorized HWH warranty repair or service center. Country Coach maintained a policy of requesting its warranty repair providers to send replaced parts to Country Coach, in part to effectuate reimbursement from the manufacturer of the part or component when appropriate.

The Country Coach motor home purchased by the Ertzes from Mega RV featured four slideout rooms. A slideout is a box that extends from the motor home to

---

[2] We reserve additional discussion of this case's tortured procedural history until the end of this opinion.

7

provide additional living space. Hydraulic components sold by HWH to Country Coach were integral to the operation of the slideout rooms in the Ertzes' motor home.

John Ertz received two written warranties from Country Coach at the time he purchased the motor home. There is no mention in John's testimony about any warranty from HWH. Much of John's testimony pertains to the problems he had with his motor home and the efforts undertaken to repair his motor home. HWH is not mentioned during this testimony. John does not recall receiving any communications at any time from HWH. John did not attempt to notify HWH at any time of problems with his motor home. John filed this lawsuit because he could not enjoy the use of his motor home as a result of problems with the slideout rooms.

Vincent Edward Anderson is a service technician at Mega RV. In response to a January 2007 complaint about the slideouts, Anderson found a leaking hydraulic hose and replaced it. Anderson received permission to replace the hose from Country Coach; the work was performed under the Country Coach warranty. Country Coach paid Mega RV for the repair.

Ryan Smith worked as a dealer service representative for Country Coach prior to its demise. There were multiple calls with regard to issues with the slideout rooms on the model sold to the Ertzes; "[i]t seemed like it was becoming a repetitive issue." Smith talked to John on April 26, 2007 about problems with the slideouts, which were not working. Smith arranged for an unspecified repair service (not Mega RV) to perform a repair on the Ertzes' motor home in Las Vegas. Smith also personally replaced a "solenoid" because "the pressure relief portion of the solenoid valve was bent," resulting in leaking hydraulic fluid. The slide-out rooms continued to cause problems for the Ertzes. Mega RV performed additional repairs in May 2007. Smith authorized work at Temecula Valley R.V. in June 2007 because John did not want to return to Mega RV for additional servicing.

8

A family-owned repair firm in Arizona also worked on the motor home in November 2007. A Country Coach representative requested the work on behalf of John. A hydraulic hose was leaking on the passenger rear side of the motor home. The hose had detached from a brass fitting previously attached to the motor home at some unknown time. This brass fitting was not on the motor home in January 2007 and should not have been attached to the motor home and the HWH hydraulic components. The brass fitting was not manufactured by HWH. There was no direct evidence in the record regarding who attached the brass fitting and when it was attached. HWH argued this fitting must have been attached in April 2007 by the unspecified repair firm hired by Smith. HWH argued this showed Mega RV's negligence because Mega RV should have discovered the fitting in its May 2007 servicing of the motor home.

HWH Chief Executive Officer Paul Hanser testified, both as a percipient and expert witness. Hanser opined that none of the HWH products were defective on the Ertz motor home. Hanser stated, "HWH provides warranty information to Country Coach, and then they distribute it. We did not specifically hand Mr. Ertz a warranty card." There is only one warranty provided by HWH and it pertains to "the leveling system." The Ertzes "could have contacted HWH for warranty service under the warranty" if there was an issue with the leveling system. HWH did not provide any written warranty to Mega RV. According to Hanser, Mega RV completed a normal replacement job of the hydraulic hose in January 2007 and he "found nothing on the [replaced] hose that was of concern." Instead, the fundamental problem with the motor home was the Country Coach design, which exposed hydraulic components to temperatures above 180 degrees.

*Court's Ruling and Judgment*

The court ultimately ruled in favor of HWH, determining HWH had no obligation to indemnify Mega RV. The court also ruled that HWH was entitled to

damages in the amount of $166,000 pursuant to the tort of another rule, based on Mega RV's negligence "with regard to a service that it performed on the motor home owned by the plaintiffs."[3] Based on its rulings on HWH's cross-complaint, the court also granted HWH's motion for judgment on the pleadings as to Mega RV's cross-complaint. The court entered a separate judgment on the cross-complaints filed by Mega RV and HWH in accordance with these rulings.[4]

DISCUSSION

Mega RV contends the court erred (1) in its conclusion that HWH cannot be held liable for indemnity, (2) in its award of damages to HWH, and (3) in its decision to try HWH's cross-complaint separately from the rest of the case.

*HWH is Not Obligated to Indemnify Mega RV*

As to whether HWH must indemnify Mega RV under section 1792, we are presented primarily with questions of statutory interpretation and construction. Does the Act (and in particular § 1792) apply only to the single manufacturer occupying the terminal stage of the manufacturing process? If so, HWH cannot be liable in indemnity under the Act to Mega RV regardless of the factual circumstances of this case.

---

[3] Extensive portions of the record and the parties' briefs are devoted to voluminous motion practice by the parties (e.g., wrangling as to the propriety of several different versions of the statement of decision, motions for judgment on the pleadings, motion for a new trial). For the most part, because our analysis is driven by de novo review of the legal issues in this case, we can ignore this morass. As noted above, however, we shall return to the procedural history of the case at the end of the opinion.

[4] By a January 10, 2014 order, this court determined that the separate judgment adjudicating the rights of HWH and Mega RV was appealable and that the case should not be dismissed for lack of jurisdiction.

10

Conversely, does section 1792 potentially apply to multiple entities participating in the manufacturing chain of production? If so, under what circumstances are component part manufacturers subject to the Act? In answering these questions, "our task is to ascertain the intent of the Legislature so as to effectuate the purpose of the enactment. [Citation.] We look first to the words of the statute, which are the most reliable indications of the Legislature's intent. [Citation.] We construe the words of a statute in context, and harmonize the various parts of an enactment by considering the provision at issue in the context of the statutory framework as a whole." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487 (*Cummins*).) "[I]f the statutory language 'is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .'" (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 750.)

We thus turn to our independent interpretation and construction of section 1792. "Unless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable. *The retail seller shall have a right of indemnity against the manufacturer* in the amount of any liability under this section." (§ 1792, italics added.) In isolation, section 1792 does not definitively answer the question presented. Section 1792 uses singular nouns when referring to "the manufacturer," both with regard to the provision of an implied warranty to the consumer and an indemnity right to the retail seller. But, in interpreting the Civil Code, the use of "the singular number" can "include[] the plural." (§ 14.) Without additional context, it is unclear whether the Legislature intended section 1792 to apply to only the ultimate manufacturer, to any manufacturer playing a role in the production process, or to some but not all component manufacturers.[5]

---

[5] The current version of section 1792 took effect after the 1978 amendment of the Act. (Stats. 1978, ch. 991, § 3, p. 3060.) The original version of section 1792 stated, "Unless disclaimed in the manner prescribed by this chapter, every sale or

11

The definitions section of the Act lends some credence to both parties' contentions. "'Manufacturer' means *any* individual, partnership, *corporation*, association, or other legal relationship *that manufactures, assembles, or produces consumer goods.*" (§ 1791, subd. (j), italics added.) "'Consumer goods' means *any new product or part thereof* that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables." (*Id.*, subd. (a), italics added.) "'Buyer' or 'retail buyer' means any individual who buys consumer goods from a person engaged in the business of manufacturing, distributing, or selling consumer goods at retail." (*Id.*, subd. (b).) "'Retail seller' . . . means any individual, partnership, corporation, association, or other legal relationship that engages in the business of selling or leasing consumer goods to retail buyers." (*Id.*, subd. (l).)

Relying on these definitions, Mega RV posits HWH logically must be classified as a manufacturer under the Act and section 1792: (1) HWH manufactured hydraulic components; (2) the hydraulic components became a "part" (§ 1791, subd. (a)) of the motor home upon assembly by Country Coach; (3) Country Coach delivered the motor home to the retail seller, Mega RV; (4) Mega RV sold the motor home, of which the hydraulic system was a "part," to buyers (the Ertzes) for their personal use as a consumer good; and (5) a motor home is clearly a consumer good under the Act (see *National R.V., Inc. v. Foreman* (1995) 34 Cal.App.4th 1072, 1076-1083 (*Foreman*)).

consignment of consumer goods in this state by a manufacturer shall be accompanied by an implied warranty that the goods are merchantable." (Stats. 1970, ch. 1333, § 1, p. 2480.) Section 1792 was amended the next year as follows, "Unless disclaimed in the manner prescribed by this chapter, every sale or consignment for sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's implied warranty that the goods are merchantable." (Stats. 1971, ch. 1523, § 4, p. 3003.) Arguably, references to consignments in these earlier versions tend to suggest that section 1792 was meant to apply only to the final manufacturer (the one that had a relationship with the retail seller, to whom the goods would presumably be consigned). But this analysis of legislative history is hardly conclusive with regard to the prior versions of section 1792, let alone the current version eschewing mention of consignment.

While not an irrefutable syllogism, Mega RV's position is certainly a plausible reading of the Act.

HWH, on the other hand, emphasizes the distinction between the acquisition of the hydraulic components by Country Coach and the purchase of the motor home by the Ertzes. The HWH hydraulic components were not consumer goods when Country Coach acquired them from HWH in Iowa, both because they were not yet sold at retail as consumer goods and because they were not sold in California. (See *Cummins*, *supra*, 36 Cal.4th at p. 483 [Act only applies to goods purchased in California].) The hydraulic components only became part of a consumer good once the Ertzes purchased the entire motor home from Mega RV in California. According to HWH, it makes no sense for component part manufacturers to be included within the scope of the Act, given the lack of a necessary relationship between the component manufacturer and the retail seller or buyer. By HWH's reasoning, the inclusion of the phrase "or part thereof" in the definition of "'[c]onsumer goods'" (§ 1791, subd. (a)) is meant only to make clear that the Act applies to individual parts of a larger whole that are sold separately to a retail buyer (i.e., the consumer is entitled to the remedies provided by the Act even if the consumer purchases only a part to be used in a larger item, such as a new battery for a previously purchased automobile), not to sweep component manufacturers of parts sold within a greater whole into the reach of the Act.[6]

_____

[6] This position has some support in legislative history. The original definition of "'[c]onsumer goods'" in the Act was "any motor vehicle, machine, appliance, or like product that is used or bought for use primarily for personal, family, or household purposes." (Stats. 1970, ch. 1333, § 1, p. 2478.) The next year, the definition of "'[c]onsumer goods'" was amended to "any new mobilehome, motor vehicle, machine, appliance, like product, *or part thereof* that is used or bought for use primarily for personal, family or household purposes. 'Consumer goods' also means any new good or product, except for soft goods and consumables, the retail sale of which is accompanied by an express warranty to the retail buyer thereof and such product is used or bought for use primarily for personal, family, or household purposes." (Stats. 1971, ch. 1523, § 2, p. 3001, italics added.) Perhaps casting some light on the history of this amendment "and

13

Other sections of the Act inform the debate, but not definitively. What exactly is the implied warranty of merchantability "the manufacturer" is deemed to provide to consumers pursuant to section 1792 absent an effective disclaimer thereof? "'Implied warranty of merchantability' . . . means that the consumer goods meet each of the following: [¶] (1) Pass without objection in the trade under the contract description. [¶] (2) Are fit for the ordinary purpose for which such goods are used. [¶] (3) Are adequately contained, packaged, and labeled. [¶] (4) Conform to the promises or affirmations of fact made on the container or label." (§ 1791.1, subd. (a).) "Unlike express warranties, which are basically contractual in nature, the implied warranty of merchantability arises by operation of law. [Citation.] It does not 'impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality.'" (*American Suzuki Motor Corp. v. Superior Court* (1995) 37 Cal.App.4th 1291, 1295-1296 [discussing similar Commercial Code implied warranty of merchantability].) The nature of the implied warranty of merchantability tends to argue against the wholesale application of the Act to component part

the arguments before the Legislature when it considered the matter" (see *County of San Diego v. Superior Court* (1986) 176 Cal.App.3d 1009, 1021) is March 1971 correspondence between Senator Alfred Song (a sponsor of the Act) and James Hamilton, the Executive Vice President of the California Automotive Wholesalers Association. Hamilton inquired as to whether "the definition of consumer goods includes the component parts of motor vehicles, such as engine parts, fuel pumps, starters, carburetors, brake shoes, and the thousands of other replacement parts our members handle." (Executive Vice-president James E. Hamilton, Cal. Automotive Wholesalers' Assn., letter to Sen. Alfred H. Song, Mar. 18, 1971.) Senator Song replied, "It was certainly our intent to include component parts of motor vehicles under the coverage of the Act when such parts are sold on a retail basis to consumers. We believe that the retail sale of such parts is presently covered by the Act, and we will shortly be introducing clarifying amendments, one a provision of which we will specifically list parts under the definition of consumer goods." (Sen. Alfred H. Song, letter to Executive Vice-president James E. Hamilton, Mar. 26, 1971.) Our review of legislative history does not disclose any concern with the problem of manufacturers whose components had been integrated into a consumer good that was then sold at retail.

manufacturers. Some of the categories are not in tune with the typical role of a component part manufacturer, such as the container, packaging, and labeling of the good. In addition, to warrant that all components are fit for an ordinary purpose would be strange, given that the components have often been utilized for a particular purpose within the larger consumer good of which they became a part. Unless it were easy to separate the performance of the specific component at issue from the whole, the overall thrust of this warranty seems more suited to the final product rather than the component parts therein.

Sections of the Act pertaining to express warranties[7] are problematic for both parties' positions. Entities regulated under the Act typically have the option of either providing an express warranty or not providing an express warranty in connection with the sale of consumer goods to retail buyers. (§ 1793 ["nothing in [the Act] shall affect the right of the manufacturer, distributor, or retailer to make express warranties with respect to consumer goods"]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 121 ["If a manufacturer elects to provide an express warranty . . . the Act protects buyers in a number of ways"].) Manufacturers choosing to provide an express warranty, however, are subject to specific requirements set forth in the Act. For instance, "[e]very manufacturer . . . making express warranties with respect to consumer

---

[7] "'Express warranty' means: [¶] (1) A written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation if there is a failure in utility or performance; or [¶] (2) In the event of any sample or model, that the whole of the goods conforms to such sample or model." (§ 1791.2, subd. (a).) "It is not necessary to the creation of an express warranty that formal words such as 'warrant' or 'guarantee' be used, but if such words are used then an express warranty is created. An affirmation merely of the value of the goods or a statement purporting to be merely an opinion or commendation of the goods does not create a warranty." (*Id*., subd. (b).) "Statements or representations such as expressions of general policy concerning customer satisfaction which are not subject to any limitation do not create an express warranty." (*Id*., subd. (c).)

goods shall fully set forth those warranties in simple and readily understood language . . . ." (§ 1793.1, subd. (a)(1).) Moreover, "[e]very manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty shall" maintain repair facilities or designate independent repair facilities reasonably close to the areas in which the goods are sold. (§ 1793.2, subd. (a).)

A manufacturer opting not to provide an express warranty may also disclaim the implied warranty of merchantability by conspicuously and clearly informing the buyer of statutorily specified disclosures and limitations on liability. (See §§ 1792.4-1792.5.) But "a manufacturer, distributor, or retailer, in transacting a sale in which express warranties are given, may not limit, modify, or disclaim the implied warranties guaranteed by this chapter to the sale of consumer goods." (§ 1793.) Thus, "the manufacturer's and the retail seller's implied warranty that the goods are merchantable" (§ 1792) fits hand in glove with the Act's regulation of the quality of express warranties. By requiring an implied warranty of merchantability to accompany any express warranties, the Act ensures that retail buyers in receipt of an express warranty have a minimum level of substantive protection. This statutory structure undermines the facile suggestion that the manufacture of any "part" of a consumer product subjects the component manufacturer to section 1792. Unlike the manufacturer who ships the completed good to the retail seller, a component part manufacturer may not be in a position to craft an express warranty or disclaim an implied warranty.

But what if a component manufacturer provides an express warranty to the consumer?[8] Is such an express warranty governed by the Act? Section 1795 answers this question in the affirmative, even assuming a component manufacturer is not a

---

[8] Consider the warranty commonly provided by tire manufacturers to purchasers of new cars (alongside that of the vehicle's manufacturer). Or consider the warranty provided with regard to the "leveling system" by HWH in this case.

16

"manufacturer" under the Act: "If express warranties are made by persons other than the manufacturer of the goods, the obligation of the person making such warranties shall be the same as that imposed on the manufacturer under this chapter." (*Ibid*.) Indeed, some cases brought under the Act name multiple manufacturers as defendants. (See, e.g., *Cummins*, *supra*, 36 Cal.4th at p. 483 [suit against Winnebago Industries, Inc., and Cummins, Inc., the engine manufacturer]; *Tiffin Motorhomes, Inc. v. Superior Court* (2011) 202 Cal.App.4th 24, 27-28, 32-33 (*Tiffin*) [separate manufacturers of engine, coach, and chassis of motor home all provided separate warranty and were sued under the Act; HWH also mentioned as a defendant, presumably based on its provision of component parts]; *Foreman*, *supra*, 34 Cal.App.4th at pp. 1074-1076 & fns. 3 & 4 [General Motors Corporation, which expressly warranted the chassis portion of the motor home manufactured by National R.V., Inc., was held liable by jury under the Act; no mention of an implied warranty action under § 1792].)[9] At the very least, it seems the Act applies in some measure to component manufacturers when they provide express warranties to retail buyers.[10]

---

[9]    It must be noted that these cases did not actually interpret the Act to apply to component manufacturers. Rather, this question was not presented for review by the appellate courts in any of the cases.

[10]    Section 1793.05 is another interesting provision of the Act for our interpretive purposes: "Vehicle manufacturers who alter new vehicles into housecars shall, in addition to any new product warranty, assume any warranty responsibility of the original vehicle manufacturer for any and all components of the finished product which are, by virtue of any act of the alterer, no longer covered by the warranty issued by the original vehicle manufacturer." Section 1793.05 (without distinguishing between express and implied warranties) illustrates that in at least some circumstances, there can be two manufacturers providing warranties to consumers under the Act (the "housecar" alteration vehicle manufacturer and the original vehicle manufacturer with regard to any warranty responsibilities that have not been revoked by reason of the alterations). But by explicitly providing for the party making the alterations to the finished vehicle to step into the shoes of the "original vehicle manufacturer" in the case of warranties voided through alteration, does section 1793.05 suggest that the ordinary state of affairs would

17

Although yielding important insights, neither the structure of the Act nor legislative history definitively answers whether and in what circumstances section 1792 applies to component part manufacturers.  Without careful analysis, a federal district court suggested a computer chip manufacturer (NVIDIA Corporation) might be subject to section 1792 breach of implied warranty claims based on the presence of its allegedly defective chips in Hewlett Packard personal computers sold to consumers in California. (*In re NVIDIA GPU Litig.* (N.D.Cal. Nov. 19, 2009, No. C 08-04312 JW) 2009 U.S.Dist. Lexis 108500 [granting motion to dismiss but allowing leave to amend to limit class allegations to purchases in California].)  Outside of this case (which is of little help), there is no guidance in case law applying the Act with regard to the specific question presented.

Having failed to discover a clear rule in the language of the Act or case authority, we shift our focus to the purposes of the Act.  (*Foreman*, *supra*, 34 Cal.App.4th at p. 1077.)  The Act "was enacted to address the difficulties faced by consumers in enforcing express warranties.  Consumers frequently were frustrated by the inconvenience of having to return goods to the manufacturer for repairs and by repeated unsuccessful attempts to remedy the problem.  [Citation.]  The Act protects purchasers of consumer goods by requiring specified implied warranties, placing strict limitations on how and when a manufacturer may disclaim those implied warranties, and providing mechanisms to ensure that manufacturers live up to the terms of any express warranty." (*Cummins*, *supra*, 36 Cal.4th at p. 484.)  "[T]he Act is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184.)

---

be for a single manufacturer to provide warranties with regard to any and all components of the finished product or the opposite?

The Act consists of enhancements to the rights of consumer purchasers of goods. (See *Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 213 ["The Act regulates warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties"].) But the California Uniform Commercial Code still governs other sales of goods issues. (See § 1790.3; Cal. U. Com. Code, § 2101 et seq.) It would be misguided to view nonconsumer transactions (e.g., the sale of hydraulic parts by HWH to Country Coach) through the prism of the Act rather than the California Uniform Commercial Code. It would also be misguided to overstate the extent to which the Act changes sales of goods law even in consumer transactions. (§ 1790.3 ["The provisions of this chapter shall not affect the rights and obligations of parties determined by reference to the Commercial Code except that, where the provisions of the Commercial Code conflict with the rights guaranteed to buyers of consumer goods under the provisions of this chapter, the provisions of this chapter shall prevail"].)[11]

---

[11] Of relevance here, "[u]nder California Commercial Code section 2314, the implied warranty provision . . . , a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant. [Citation.] A buyer and seller stand in privity if they are in adjoining links of the distribution chain." (*Clemens v. DaimlerChrysler Corp.* (9th Cir. 2008) 534 F.3d 1017, 1023.) Mega RV typically would not be entitled to sue HWH under the California Uniform Commercial Code for breach of an implied warranty because the two parties are not in privity with regard to the Ertzes' motor home. (*Ibid*; but see *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 481 ["manufacturers of component parts, here windows, that are installed in mass-produced homes can be subject to strict products liability in tort when their defective products cause harm"].) Of course, under the Act, the buyer can sue "the manufacturer" for breach of the implied warranty of merchantability despite a lack of privity. (*Gusse v. Damon Corporation* (2007) 470 F.Supp.2d 1110, 1116, fn. 9.)

Considering the policies, purposes, and scope of the Act, there is no obvious, nonspeculative benefit to including *every* component or part supplier within the scope of section 1792. To the contrary, the suggestion that section 1792 refers to *every* manufacturer contributing a "part" to the finished product would at best create confusion for the consumer, the retail seller, and the various entities playing a role in the manufacturing process. At worst, such an interpretation would create legal uncertainty as to the liability of the ultimate manufacturer for component part defects, based on the theory that if the component is considered a separable consumer good for purposes of imposing liability on a component manufacturer, it could also be considered a separable consumer good for purposes of *not* imposing liability on the ultimate manufacturer.[12]

Moreover, interpreting section 1792 to apply to every component part manufacturer would be impractical and unfair. In some cases, application of the Act by California courts to component part suppliers would be foreclosed by lack of personal jurisdiction. (See *Dow Chemical Canada ULC v. Superior Court* (2011) 202 Cal.App.4th 170, 172-173.) And even if personal jurisdiction existed, it would be unfair in some circumstances to apply consumer protection laws to component manufacturers playing only an indirect role in the provision of consumer goods to California buyers, without regard to the substantiality of the component contributed to the consumer good, the component manufacturer's knowledge that its goods would ultimately be utilized in this way, or the component manufacturer's opportunity to disclaim potential liability under section 1792. (Cf. *Cummins*, *supra*, 36 Cal.4th at pp. 492-493 [Act does not apply

---

[12] This case hints at one possible benefit to buyers in light of Country Coach's bankruptcy. Had Mega RV suffered the same fate, the Ertzes might have been left in the lurch. A rule that extends the applicability of section 1792 to every component manufacturer *might* aid a hypothetical consumer in this circumstance, if the defect complained of could be linked to a component produced by a particular manufacturer. But this speculative benefit to consumers does not overcome the problems with imposing such liability as discussed in the preceding and following paragraphs.

to sales of consumer goods outside California].)  We will not presume the Legislature intended an absurd result in its drafting of section 1792 and the definition of "'[c]onsumer goods'" to include "any new product or part thereof" in section 1791, subdivision (a).  We therefore hold that the section 1792 "manufacturer" does not include every component manufacturer contributing parts or components to a consumer good.

But, as discussed above, there are tangible benefits to retail buyers in applying the Act to component manufacturers that provide express warranties to buyers.  (See *Cummins*, *supra*, 36 Cal.4th at pp. 484-485.)  In light of the purposes of the Act and consistent with the language of relevant portions of the Act, we hold an implied warranty of merchantability accompanies any express warranty provided by a component manufacturer to a retail buyer.   (See §§ 1792, 1795.)  The Act's requirement of an implied warranty of merchantability is part and parcel of the Act's regulation of express warranties.  If a component manufacturer provides an express warranty, it cannot disclaim the implied warranty of merchantability.  (§ 1793.)  Once section 1792 is interpreted to require a component manufacturer's implied warranty of merchantability in certain circumstances, it follows that a retail seller has a right to indemnity from the component manufacturer in those same circumstances.

Just as the scope of the express warranty provided by a component manufacturer would undoubtedly be limited to the component part at issue, the implied warranty of merchantability (and accompanying retail seller's right to indemnification) would likewise be adapted to the scope of the "part" provided by the component manufacturer.  (See *Tiffin*, *supra*, 202 Cal.App.4th at p. 33 [in multiple defendant warranty claim under Act, court observes defendants' "will rarely[] have caused the same harm to the plaintiffs.  Each will, however, be liable for the contract damages stemming from the breach of the contract into which that defendant entered.  These obligations are neither 'joint' nor 'joint and several' and, therefore, do not give rise to any right of contribution"].)

21

In sum, contrary to the parties' positions, the best interpretation of the Act is that some (but not all) component manufacturers (i.e., those providing express warranties to the buyer) are subject to the Act, including section 1792. If component manufacturers provide an express warranty to buyers of consumer goods under the Act, they will also be deemed to have provided an implied warranty of merchantability. In turn, such component manufacturers potentially will be liable in indemnity to retail sellers under section 1792. If a component manufacturer does not provide the consumer with an express warranty, neither the consumer nor the retail seller can seek recovery from the component manufacturer under section 1792.

Our interpretation of the Act is supported by reference to comparable interpretations of the Uniform Commercial Code in certain federal courts. Putting to one side the question of privity (as some states other than California have done), a buyer ordinarily does not have an implied warranty claim against a manufacturer of an integrated component part. (*Hininger v. Case Corp.* (5th Cir. 1994) 23 F.3d 124, 125 [affirming judgment on implied warranty claim in favor of component manufacturer, whose wheels were incorporated into agricultural combines].) This is because, unlike the buyer's relationship with "the manufacturer of the finished product," buyers of goods generally have "no expectation that . . . manufacturers of unbranded components would resolve any problem they might experience." (*Id*. at p. 128.) It "may be difficult or even impossible for a component supplier to disclaim its warranty liability," which places component suppliers in a difficult position compared to manufacturers of finished products. (*Id*. at p. 129; see *In re General Motors Corp. Anti-Lock Brake Products Liability Litigation* (E.D. Mo. 1997) 966 F.Supp. 1525, 1533-1534 [dismissing breach of implied warranty claim against manufacturer of brake system in General Motors vehicles; "none of the states in this action have specifically extended liability for breach of implied warranty to manufacturers of component parts"].)

This does not mean, however, that a self-described component part manufacturer is always immune from breach of warranty claims. Component part manufacturers of goods that could "easily be considered a stand-alone product," like a refrigerator attached to a motor home, can be held liable for breach of warranty. (*Teague v. Norcold, Inc.* (N.D. Tex. 2011) 774 F.Supp.2d 817, 821.) The *Teague* court denied a motion to dismiss an undifferentiated breach of warranty claim (i.e., the pleading did not specify whether it included implied warranties) brought by the motor home purchaser against the refrigerator manufacturer (Norcold). (*Id*. at pp. 822-823.) The allegations in the complaint suggested Norcold was in communication with its customers regarding a defect in its product; moreover, there were factual questions in the complaint regarding "the extent to which the [refrigerator] was a selling point of the RV, the extent to which the [refrigerator] was a stand-alone product from the RV, and the nature of and the extent to which Norcold *warranted* the Unit." (*Id*. at p. 822, italics added; see also *Metro Nat'l Corp. v. Dunham-Bush, Inc.* (S.D. Tex. 1997) 984 F.Supp. 538, 558-559 [component compressors were "centerpiece of the ice harvesters" sold to the plaintiff and component manufacturer was directly involved in design of final product and communication with customers, including delivery of written warranty].)[13]

The results in these federal cases hinge in large measure on the existence of component manufacturer express warranties received by the ultimate purchasers of the goods. One practical lesson from these cases is that application of the Act (including § 1792) to component part manufacturers will likely occur with readily identifiable and

---

[13] These cases do not necessarily hold that the component part manufacturers provided implied warranties of merchantability to the ultimate purchaser of the product. (See *Metro Nat'l Corp. v. Dunham-Bush, Inc.*, *supra*, 984 F.Supp. at p. 561, fn. 50 [implied warranty of fitness for a particular purpose but not merchantability applied in this case because of specialized design of product; unstated implication is that an implied warranty of merchantability would be appropriate in other circumstances].)

23

relatively important component parts, often featuring the brand name of the component part manufacturer on the component even when sold to the buyer as part of an integrated consumer good. This is because, as a matter of common sense, component part manufacturers will only provide express warranties to consumers in these circumstances.

Thus, having construed section 1792 to apply to component manufacturers under certain circumstances, we must return to the record in this case. Country Coach finalized the assembly and manufacture of the motor home at issue under its brand name, but others (including HWH) manufactured components and parts utilized in the final product delivered by Country Coach to Mega RV. Did the court correctly conclude HWH was not subject to section 1792 obligations under the specific circumstances of this case? The answer to this question is an unequivocal yes. The appellate record contains no evidentiary document, trial exhibit or otherwise, suggesting HWH provided an express warranty to the Ertzes (or even Mega RV or Country Coach) with regard to the hydraulic system at issue in this case (i.e., the mechanism whereby the slide-out rooms were manipulated). Nor is there trial testimony establishing such an express warranty.[14] Indeed, Mega RV's appellate briefs are silent as to this factual question. Mega RV's entire theory of the case on appeal is that a component part manufacturer is subject to section 1792 as a matter of law once it has been determined it manufactured a component comprising a "part" of the consumer good in question. We reject this position. HWH was not subject to section 1792 indemnity obligations. Any defect in the court's reasoning on this point in the statement of decision is beside the point, as there is no evidence to support finding HWH provided warranties to the Ertzes with regard to the hydraulic system operating the slide-out rooms.

---

[14] HWH's chief executive officer testified that a warranty was provided to the consumer with regard to the leveling system but that this was the only warranty provided by HWH. The evidence does not suggest there was any problem with the leveling system in the motor home.

*Tort of Another Doctrine*

The court erred as a matter of law in awarding damages (consisting of HWH's attorney fees) to HWH pursuant to the tort of another doctrine. Ordinarily, pursuant to the American Rule, a party must pay for its own attorney fees unless a contract or statute provides authority for recovery of attorney fees from a litigation opponent. The tort of another doctrine holds that "[a] person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 (*Prentice*).) The tort of another doctrine is not really an exception to the American Rule, but simply "an application of the usual measure of tort damages." (*Sooy v. Peter* (1990) 220 Cal.App.3d 1305, 1310 [equating recovery of attorney fees as damages to medical fees recovered in personal injury action]; see § 3333 ["the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not"].)

HWH premises its claim on the notion that Mega RV (the "other" party) was negligent (the "tort") in its servicing of the Ertzes' motor home, thereby causing HWH to incur damages (its attorney fees in this action). Even assuming the propriety of allowing HWH to raise this claim through the backdoor,[15] HWH's position fails as a matter of law because there was no tort in this case. (See *Behniwal v. Mix* (2005) 133 Cal.App.4th 1027, 1043 ["The problem we now have is, 'where's the tort?'"].)

We must first clarify the alleged tort at issue. There was no tort committed by any defendant vis-à-vis the Ertzes. The Ertzes never sued Mega RV or any other party

---

[15] To wit, HWH's negligence allegations were only present in an indemnity cause of action in its cross-complaint, in a case in which there was nothing to indemnify because the Ertzes paid HWH pursuant to the settlement agreement.

25

for negligence (or any other tort), and never alleged they suffered any personal injury or damages to other property (besides the portions of the motor home that were alleged to be defective) as a result of the alleged defects in the motor home. "It appears doubtful that a cause of action could be stated in tort [under these circumstances], as a claim based on negligence or even strict liability will not lie where the wrong has resulted only in economic loss rather than actual damage to person or property." (*Tiffin*, *supra*, 202 Cal.App.4th at p. 31, fn. 11; see *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 988-993 [discussing economic loss rule generally].) As made clear in a case holding that statutory good faith settlement rules do not apply in pure warranty actions brought under the Act, HWH's pleading of the case as one sounding in tort for purposes of indemnity did not change the essential nature of this warranty dispute. (See *Tiffin*, at pp. 32-33 [cross-complaint seeking indemnity did not convert defendants into tortfeasors].)

HWH alleges Mega RV was negligent *to HWH* in its servicing of the Ertzes' motor home. Like the Ertzes, HWH did not suffer personal injury or injury to other property as a result of Mega RV's alleged tort. HWH alleges it suffered consequential economic damages (its attorney fees incurred in this case, allegedly as a result of negligent repair of the motor home by Mega RV years earlier). Unlike the Ertzes and Country Coach, HWH did not have a contractual relationship with Mega RV. HWH essentially contends this court should recognize HWH's right to recover its economic losses from Mega RV in tort.

The most fundamental problem with this line of argument is that Mega RV did not owe a duty of care to HWH in connection with its servicing of the Ertzes' motor home.[16] "Duty . . . is a legal issue and must be determined by the court. [Citation.] A

---

[16] We reject HWH's contention that Mega RV "abandoned or waived" the argument that it had no duty to HWH. We also note that by limiting our analysis to the question of duty, we by no means endorse the notion that HWH's attorney fees in this

duty of care may arise through statute, contract, the general character of the activity, or the relationship between the parties." (*Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 604.) "[E]ntities generally have no *duty* to prevent purely economic loss to a potential plaintiff. [Citation.] Under the common law, it is only where a 'special relationship' exists, giving rise to such a duty [citation], that a plaintiff may recover purely economic loss." (*Greystone Homes, Inc. v. Midtec, Inc.* (2008) 168 Cal.App.4th 1194, 1215.) "Courts are reluctant to impose duties to prevent economic harm to third parties because '[a]s a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence and contracting power, as well as other informational tools.'" (*Ratcliff Architects*, at p. 605.)

The tort of another doctrine applies to economic damages (i.e., attorney fees incurred in litigation with third parties) suffered as a result of an alleged tort.[17] As

action were caused by Mega RV's repair of the vehicle. Nor do we agree with the amount of attorney fees awarded by the court even if this were a proper tort of another case in the abstract (i.e., most of HWH's attorney fees were actually incurred in connection with litigation against Mega RV, not against third party, the Ertzes).

[17] The tort of another doctrine is not particularly relevant in cases involving physical injury or property damage. To state the obvious, a tortfeasor who causes physical damage to a person or property (for instance, in a car accident) would be subject to a negligence lawsuit by the affected individual. The plaintiff in this hypothetical case could not recover her attorney fees from the tortfeasor under the tort of another doctrine. The attorney fees in this straightforward negligence case would be "attorney fees qua attorney fees." (*Sooy v. Peter*, *supra*, 220 Cal.App.3d at p. 1310.) To hold otherwise would obliterate the American Rule in tort cases. Nor does the tort of another doctrine apply as between multiple alleged tortfeasors (e.g., what if our hypothetical plaintiff unsuccessfully sued additional defendants in the car crash case, who sought recovery of their attorney fees from the true tortfeasor?). "The extension of the *Prentice* rule to the commonplace case of an exonerated alleged tortfeasor would go a long way toward abrogation of the American rule . . . . It would substantially expand the notion of duty under the law of torts to compensation of the litigation expenses incurred by all persons, however connected to any tortious event, whom the injured plaintiff elects to sue who succeed in establishing lack of liability." (*Watson v. Department of Transportation* (1998) 68 Cal.App.4th 885, 894.)

27

such, "nearly all of the cases which have applied the [tort of another] doctrine involve a clear violation of a traditional tort duty between the tortfeasor who is required to pay the attorney fees and the person seeking compensation for those fees." (*Sooy v. Peter*, *supra*, 220 Cal.App.3d at p. 1310; *id.* at pp. 1311-1312; see also, e.g., *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 502, 507-508 [real estate broker breaches fiduciary duty to buyer]; *Prentice*, *supra*, 59 Cal.2d at pp. 619-621 [escrow agent breaches duty of due care to seller]; *Heckert v. MacDonald* (1989) 208 Cal.App.3d 832, 834-835, 837-838 [real estate broker breaches fiduciary duty to seller].) We are unaware of any authority for the existence of a special relationship or traditional tort duty between a retail seller/servicer of consumer goods and a component part manufacturer.

Nevertheless, HWH contends general principles of negligence law (e.g., § 1714, subd. (a)) require this court to impose a duty on Mega RV.[18] Thirty-five years ago, our Supreme Court analyzed the circumstances in which a party has a duty of care to avoid imposing economic losses on third parties. (See *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799 (*J'Aire*).) In *J'Aire*, a commercial lessee alleged it suffered $50,000 in lost profits as a result of unreasonable delay in completing construction at the tenant's business location by a contractor hired by the landlord. (*Id.* at pp. 802-803.) The trial court sustained the contractor's demurrer to a negligence cause of action, but our Supreme Court reversed. (*Id.* at pp. 802-803, 808 ["a contractor owes a duty of care to the tenant of a building undergoing construction work to prosecute that work in a manner

---

[18] Tellingly, in making its argument, HWH's brief relies primarily on tort cases involving physical harm to plaintiffs. It is one thing to impose routinely a duty of care when physical harm is at stake. (See Rest.3d Torts, Liability for Physical and Emotional Harm, § 7(a) ["An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm"].) It is quite another to apply an identical rule to cases involving only economic loss. (See Rest.3d Torts, Liability for Economic Harm (Tent. Draft No. 1, Apr. 4, 2012) § 1(a) ["An actor has no general duty to avoid the unintentional infliction of economic loss on another"].)

which does not cause undue injury to the tenant's business, where such injury is reasonably foreseeable"].)[19] In doing so, the *J'Aire* court observed that its holding was "consistent with the Legislature's declaration of the basic principle of tort liability, embodied in . . . section 1714, that every person is responsible for injuries caused by his or her lack of ordinary care. [Citation.] That section does not distinguish among injuries to one's person, one's property or one's financial interests. Damages for loss of profits or earnings are recoverable where they result from an injury to one's person or property caused by another's negligence. Recovery for injury to one's economic interests, where it is the foreseeable result of another's want of ordinary care, should not be foreclosed simply because it is the only injury that occurs." (*Id.* at p. 806, fn. omitted.)

*J'Aire* set forth six "criteria" for determining whether a special relationship exists pursuant to which a tort duty should be imposed: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." (*J'Aire*, *supra*, 24 Cal.3d at p. 804; see also *Biakanja v. Irving* (1958) 49 Cal.2d 647, 648-651 [applying these factors and holding that notary public who prepared defective will had duty to intended beneficiary].)[20] "Ultimately, duty is a question of public policy.

---

[19] The statement of facts indicated that "[u]nder the terms of the lease the [landlord] was to provide heat and air conditioning." (*J'Aire*, *supra*, 24 Cal.3d at p. 802.) Left unsaid in *J'Aire* was why this dispute was not better left to the realm of landlord-tenant law. (See Rest.3d Torts, Liability for Economic Harm (Tent. Draft No. 1, *supra*) § 1, com. e, illus. 3 HR ["[Tenant] can readily enough seek protection against the cost of delays in its contract with [landlord] or by other means"]; *id.* at reporter's note e, illus. 3 HR ["*J'Aire* has not been overruled, but the extent of its vitality in California is questionable . . . and it has not been influential elsewhere"].)

[20] These duty factors are similar to, but not identical with, the duty factors identified by our Supreme Court in cases involving physical injuries rather than purely

[Citation.] When determining whether a duty of care exists" in a purely economic loss case, courts examine and balance the factors set forth above. (*Ratcliff Architects v. Vanir Construction Management, Inc.*, *supra*, 88 Cal.App.4th at p. 605.)

Applying the *J'Aire* factors, Mega RV did not owe a duty of care to HWH in servicing the Ertzes motor home. Mega RV was performing its repair services on behalf of the Ertzes and Country Coach; as such, there is no indication the transaction was intended to affect HWH. It was not foreseeable that a component manufacturer like HWH would ultimately become involved in litigation between a buyer, retail seller, and manufacturer of a motor home, particularly when the component manufacturer had not provided an express warranty with regard to the allegedly defective components of the motor home or taken any direct or indirect part in the repair of the motor home. It took Country Coach's bankruptcy and creative lawyering on the part of Mega RV to pull HWH into the case.[21] As suggested by this analysis, the harm ultimately suffered by

economic loss: "'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.'" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 113.) The main difference between the two sets of factors is the absence of the first *J'Aire* factor ("the extent to which the transaction was intended to affect the plaintiff") in the physical injury context. (*J'Aire*, *supra*, 24 Cal.3d at p. 804.) This makes sense. Recall our hypothetical negligent driver from footnote 17. His lack of intent to affect the particular victim of the car crash should have no bearing on the question of whether he had a duty to drive with due care and avoid injuring other drivers. But what if the accident caused a traffic jam on the freeway? Should our driver (who we are positing had a duty of care as to the victim who suffered physical injury and property damage in the crash) have a duty to the occupants of vehicles behind the traffic jam, such that any economic damages they suffer as a result of the traffic jam are recoverable? The introduction of this additional factor into the economic loss criteria is useful in avoiding such a result.

[21] To the extent HWH finds actionable fault with Mega RV's litigation

30

HWH (i.e., its costs of dealing with this lawsuit, including attorney fees) was extremely speculative at the time Mega RV committed its supposed tort of failing to notice the installation of an improper part on the motor home during servicing. Of course, it is certain that HWH actually suffered harm in the form of attorney fees as a result of this litigation. But the connection between HWH's harm and Mega RV's servicing of the motor home is extremely attenuated. There is no moral blame attached to Mega RV's servicing repair failures, even assuming failures occurred; there was certainly no evidence of reckless or purposeful behavior, or of anything other than economic damages suffered by anyone involved in this case. Imposing a duty on retail sellers to component part manufacturers like HWH would not reduce the likelihood of future harm; retail sellers like Mega RV already have strong incentives (relationship with retail buyers, relationship with manufacturers, financial liability, reputation) to perform adequate repair and warranty services.

In sum, because Mega RV had no duty to HWH with regard to the servicing of the Ertzes' motor home, there was no tort. And because there was no tort, the tort of another doctrine cannot apply.

*Court Did Not Abuse Its Discretion in Trying These Issues Separately*

Finally, Mega RV contends the court abused its discretion by trying the HWH cross-complaint separately from and prior to the rest of the case. (See *General Motors Corp. v. Superior Court* (1966) 65 Cal.2d 88, 91 ["related disputes should be heard and decided in one proceeding whenever possible"].) Obviously, determining questions of indemnity between Mega RV and HWH before the plaintiffs' complaint was

choices (i.e., moving to join HWH as a defendant and filing a cross-complaint against HWH), the appropriate remedy is a malicious prosecution cause of action, pursuant to which HWH's attorney fees in this case could be recovered if liability were established. The tort of another doctrine cannot be used to escape the strict limits placed on the tort of malicious prosecution.

adjudicated was an interesting choice by the trial court. It must be remembered, however, that Mega RV contributed to this situation by agreeing to arbitrate the Ertzes' claims on the eve of trial.

In between the beginning of trial and the entry of judgment, unfortunate procedural quirks multiplied. First, on September 20, 2011, after the close of HWH's case, the court initially ruled in favor of Mega RV on its motion for directed verdict as to HWH's equitable indemnity claim (which, as noted above, somehow encompassed a negligence claim for attorney fee damages). Although the court indicated it would rule against Mega RV as to the question of indemnity under the Act, Mega RV opted not to put on any additional witnesses. Counsel for HWH requested a statement of decision.

On November 18, 2011, the court granted the Ertzes' motion to return their complaint "to the civil active list." Apparently, the arbitrator selected by the parties could not participate and the court concluded the agreement to arbitrate was contingent on the satisfaction of this condition.

On December 9, 2011, the court suggested that, in the course of preparing its statement of decision, it was reconsidering its ruling granting judgment to Mega RV on HWH's third cause of action. On January 13, 2012, the court reversed its prior ruling. The court denied Mega RV's request for a mistrial. Instead, the court reopened the trial to allow Mega RV to call additional witnesses. In its ultimate, 62-page statement of decision filed in July 24, 2012, the court made a variety of factual findings pertaining to the causes of the motor home's malfunctions and ruled in favor of HWH in all respects. On September 7, 2012, the court then granted HWH's motion to sever Mega RV's cross-complaint and HWH's motion for judgment on the pleadings with regard to Mega RV's cross-complaint.

Mega RV represents in its brief that plaintiffs (the Ertzes) now seek to use the statement of decision as establishing facts against Mega RV in the pending trial.

32

Apparently, the trial is stayed pending the outcome of this appeal. HWH explicitly states in its brief that collateral estoppel should apply against Mega RV in the Ertz trial.

In our view, the court did not abuse its discretion in allowing a scheduled trial to proceed (even though some of the claims were moved to arbitration) and completing a trial it had already begun under unfortunate circumstances that were created by the parties. But as established in our analysis of the substantive issues above, the court's analysis went far afield by reaching issues unnecessary to the adjudication of the dispute between the parties. There are three straightforward rulings the court should have made. First, Mega RV was not entitled to indemnity from HWH under the Act because HWH was a component part manufacturer that did not provide an express warranty to the Ertzes with regard to the slide-out hydraulic components at issue in this case. Second, HWH was not entitled to equitable indemnity from Mega RV under any circumstances because HWH had already obtained a dismissal (and cash settlement) from the Ertzes. Third, Mega RV had no duty to HWH with regard to the repair of the Ertzes' motor home; the tort of another doctrine therefore does not apply to the attorney fees incurred by HWH. Any factual findings about defects in the motor home or the causes of such defects were unnecessary to the adjudication of the issues between HWH and Mega RV. (See *First N.B.S. Corp. v. Gabrielsen* (1986) 179 Cal.App.3d 1189, 1196 ["When determination of an issue was entirely unnecessary to the former judgment, it will not have collateral estoppel effect"].)

## DISPOSITION

The award of $166,000 in damages to HWH and against Mega RV, as well as language in the judgment contemplating the award of additional attorney fee damages to HWH for postjudgment proceedings, are stricken. Declaratory relief in the judgment indicating that HWH is entitled to recover attorney fees is stricken. The prospective

33

award of costs to HWH in the judgment pursuant to Code of Civil Procedure section 1032 is stricken. The judgment is affirmed as modified. The parties shall bear their own costs on appeal.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.