[No. D018336. Fourth Dist., Div. One. May 4, 1995.]

NATIONAL R.V., INC., Defendant and Appellant, v.
JULIUS E. FOREMAN et al., Plaintiffs and Respondents.

[Opinion certified for partial publication.[1]]

___

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

**Counsel**

Wright, Robinson, McCammon, Osthimer & Tatum, Paul H. Burleigh and Robert G. Harrison for Defendant and Appellant.

Haight, Brown & Bonesteel, Robert L. Kaufman and Tammy L. Andrews as Amici Curiae on behalf of Defendant and Appellant.

Rosner, Law & McGee and Douglas D. Law for Plaintiffs and Respondents.

Luce, Forward, Hamilton & Scripps and Vickie E. Turner as Amici Curiae on behalf of Plaintiffs and Respondents.

**Opinion**

**HALLER, J.**—This case presents the issue whether the coach portion of a motorhome is subject to the provisions of the Song-Beverly Consumer Warranty Act (Civ. Code,[2] § 1790 et seq.). We conclude it is.

### Facts

In May 1990, Julius E. Foreman and his wife, Maxine I. Foreman, purchased a new 1990 Dolphin motorhome from 10,000 R.V. Sales for $56,905.41. National R.V., Inc., (National) manufactured and expressly warranted the coach portion of the motorhome, that is, the portion of the motorhome designed primarily for human habitation. National purchased the chassis portion of the motorhome from General Motors Corporation and attached the coach portion to the chassis. General Motors Corporation expressly warranted the chassis of the motorhome.

Within days of the purchase, the engine battery of the motorhome died. A Chevrolet dealership told Foreman the wrong battery had been installed.

---

[2]All statutory references are to the Civil Code unless otherwise specified.

Foreman called 10,000 R.V. Sales, where he purchased the motorhome, and was told to take it to Budget R.V., which is an authorized service center for National. Budget put in a new battery. After a week, this battery died, and Foreman took the motorhome back to Budget R.V. Budget R.V. replaced the battery two more times, but the replacement batteries died as well. Because the battery would not hold a charge, Foreman was required to unhook the battery cables each time he left the coach sitting for any period of time during the entire time that he and his wife owned the motorhome. According to expert testimony, the draw on the engine battery was caused by a component or components installed by National.

The Foremans testified the motorhome had 25 manufacturing defects, including a stalling defect that made the motorhome stall on countless occasions during every trip they took. When the motorhome stalled, it lost the power assist feature for steering and braking, making it extremely difficult to control the motorhome. The Foremans sought repair of this defect six times, but it was never fixed. In July 1991, the Foremans decided not to drive the motorhome anymore because of the dangers posed by the stalling problem.

When the motorhome stalled and Foreman could not get it started again, he called National to request a tow and/or repairs. National arranged a tow and directed Foreman to a General Motors dealership for repair.

The Foremans' expert opined the stalling defect was most probably caused by General Motors components. The expert for General Motors opined that the stalling defect was caused by a pinched wire running along the rail frame and National was responsible for pinching the wire.

Other defects in the motorhome included misaligned window screens that could not be repaired and allowed bugs to enter the coach at will, a toilet that would not flush strongly enough to carry away solid waste because of an improperly designed drain pipe, low shower pressure, a coach water pump that did not operate properly and made the coach's lights flicker, sagging of the coach to the left caused by overloading, sagging of the entry step, and a defective electrical converter. Most of the defects, including the stalling condition, were never repaired by either National or General Motors.

The Foremans brought the motorhome in for repairs 14 times; all told, the motorhome was out of service during these repairs for more than 2 months.

On July 19, 1991, counsel for the Foremans wrote National and General Motors and demanded rescission. General Motors and National each responded by offering to repair the motorhome. The Foremans rejected these offers and filed this lawsuit on August 22, 1991.

The jury returned a special verdict that found: (1) the motorhome contained a nonconformity covered by National's warranty that substantially impaired the use, value or safety of the motorhome; (2) the Foremans gave National or its representatives a reasonable number of attempts to repair the motorhome; (3) National or its representatives failed to service or repair the Foremans' motorhome to make it conform to the express warranty after a reasonable number of attempts to repair; and (4) National's failure to service or repair the motorhome caused damages to the Foremans.[3] The jury also found the Foremans suffered $96,000 in damages. The jury assessed a civil penalty of $115,200 against National after finding that National failed to replace the motorhome or reimburse the Foremans, and National willfully failed to comply with the Song-Beverly Consumer Warranty Act.[4]

## DISCUSSION

### I. Does Song-Beverly Apply to Motorhome Coaches?

National, joined by the Recreation Vehicle Industry Association (RVIA) as amicus curiae, contends the Song-Beverly Consumer Warranty Act (Act) does not apply to the coach portion of a motorhome and therefore concludes section 1793.2, subdivision (d)—the replace-or-refund provision of the Act—is likewise inapplicable. The contention is without merit.

National's contention is predicated on the erroneous assumption that because a motorhome coach is not a "new motor vehicle" as that term is defined in section 1793.22, subdivision (e)(2),[5] motorhome coaches are therefore excluded from all aspects of the Act. As will be explained, this reasoning is flawed and evidences a fundamental misconception of the interrelation between the Act, which regulates express warranties on *consumer goods*, and the so-called "Lemon Law"[6] provisions of the Act, which relate exclusively to *"new motor vehicles."*

---

[3] The jury made the same findings with respect to General Motors. General Motors is not a party to this appeal, having settled with the Foremans after trial.

[4] The jury made similar findings with respect to General Motors's lack of compliance with the Song-Beverly Consumer Warranty Act and assessed a civil penalty of $38,400 against General Motors.

[5] Section 1793.22, subdivision (e)(2) provides:

"(e) For the purposes of subdivision (d) of Section 1793.2 and this section, the following terms have the following meanings:

". . . . . . . . . . . . . . . . . . .

"(2)'New motor vehicle' means a new motor vehicle which is used or bought for use primarily for personal, family, or household purposes. 'New motor vehicle' includes the chassis, chassis cab, and that portion of a motor home devoted to its propulsion, but does not include any portion designed, used, or maintained primarily for human habitation . . . ."

[6] The "Lemon Law" is found at sections 1793.2, subdivision (d)(2), and 1793.22.

Enacted in 1970 to improve the lot of consumers who purchase defective products, the Act contains substantive regulations of warranty terms, disclosure requirements and strengthened consumer remedies. (Stats. 1970, ch. 1333, p. 2478 et seq.) In 1982, in an attempt to provide additional protections to the purchasers of new motor vehicles, the Legislature grafted the "Lemon Law" onto section 1793.2 of the Act. (Stats. 1982, ch. 388, § 1, pp. 1720-1723.) Among other things, section 1793.2 requires manufacturers to replace a defective product or reimburse the buyer if the product cannot be repaired after a reasonable number of attempts. (§ 1793.2, subd. (d).) This replace-or-refund provision is at the heart of this appeal, in which we focus on the relation between the "Lemon Law" and the Act—of which the "Lemon Law" "is [but] a single branch." (Allen, *Putting the Squeeze on Lemons* (Dec. 1986) 6 Cal.Law. 15.)

We begin with the well-established principle that statutory construction is a question of law; accordingly, we interpret section 1793.2 and—in particular, subdivision (d) (the replace-or-refund provision)—independently of the trial court's analysis. (*Suman* v. *BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133].)

As we articulated in *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17-18 [194 Cal.Rptr. 722], the fundamental rules of statutory construction are well settled: "First, 'the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] Secondly, the provision must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity. [Citations.] Significance, if possible, should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose, as 'the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' [Citation.] ' "The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' [Citations.]" In determining intent, we first look to statutory language, giving effect to the plain meaning of the language. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

Section 1793.2 incorporates several aspects of the Act's comprehensive regulation of express warranties for consumer goods. (*Ibrahim* v. *Ford Motor Co.* (1989) 214 Cal.App.3d 878, 884 [263 Cal.Rptr. 64].) This statute requires manufacturers of consumer goods sold in California to arrange for sufficient service and repair facilities to carry out the terms of warranties

(§ 1793.2, subd. (a)); it sets a time limit for the repair of consumer goods (§ 1793.2, subd. (b)); it delineates rules for delivering nonconforming goods for service and repair (§ 1793.2, subd. (c)); and it requires a manufacturer to replace the consumer good or reimburse the buyer if the manufacturer or its representative is unable to repair the consumer good after a reasonable number of attempts (§ 1793.2, subd. (d)).

Section 1793.2, subdivision (d)[7]—the replace-or-refund provision of the Act—consists of two parts or paragraphs, one for consumer goods in general

---

[7]Section 1793.2, subdivision (d), reads in pertinent part:

"(d)(1) Except as provided in paragraph (2), if the manufacturer or its representative in this state does not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity.

"(2) If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle, as that term is defined in paragraph (2) of subdivision (e) of Section 1793.22, to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle in accordance with subparagraph (A) or promptly make restitution to the buyer in accordance with subparagraph (B). However, the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle.

"(A) In the case of replacement, the manufacturer shall replace the buyer's vehicle with a new motor vehicle substantially identical to the vehicle replaced. The replacement vehicle shall be accompanied by all express and implied warranties that normally accompany new motor vehicles of that specific kind. The manufacturer also shall pay for, or to, the buyer the amount of any sales or use tax, license fees, registration fees, and other official fees which the buyer is obligated to pay in connection with the replacement, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer.

"(B) In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer.

"(C) When the manufacturer replaces the new motor vehicle pursuant to subparagraph (A), the buyer shall only be liable to pay the manufacturer an amount directly attributable to use by the buyer of the replaced vehicle prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity. When restitution is made pursuant to subparagraph (B), the amount to be paid by the manufacturer to the buyer may be reduced by the manufacturer by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity. The amount directly attributable to use by the buyer shall be determined by multiplying the actual price of the new motor vehicle paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, by a fraction having as its denominator 120,000 and having as its numerator the number of miles traveled by the new motor vehicle prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its

(§ 1793.2, subd. (d)(1)) and one strictly for new motor vehicles (§ 1793.2, subd. (d)(2)). As set forth in the margin (see fn. 7, *ante*), section 1793.2, subdivision (d)(2), differs from section 1793.2, subdivision (d)(1), in that it gives the new motor vehicle consumer the right to elect restitution in lieu of replacement; provides specific procedures for the motor vehicle manufacturer to follow in the case of replacement (subpar. (A)) and in the case of restitution (subpar. (B)); and sets forth rules for offsetting the amount attributed to the consumer's use of the motor vehicle in the case of both replacement and restitution (subpar. (C)).[8] These "Lemon Law" provisions clearly provide greater consumer protections to those who purchase new motor vehicles than are afforded under the general provisions of the Act to those who purchase other consumer goods under warranty.

By virtue of section 1793.22, subdivision (e)(2), (see fn. 5, *ante*), the chassis portion of a motorhome is included in the definition of a new motor vehicle, but the coach portion is not included for purposes of the "Lemon Law." Consequently, as all parties to this appeal agree, motorhome coaches are not subject to section 1793.2, subdivision (d)(2). The question for us is whether motorhome coaches are consumer goods covered by section 1793.2, subdivision (d)(1)—the Act's replace-or-refund provision of general application.

The term "consumer goods" as used in the Act is defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables. . . ." (§ 1791, subd. (a).)

From an examination of the statutory language, it is clear that the Act's definition of "consumer goods" encompasses a motorhome coach, which is a unit designed for human habitation that is attached to a motor vehicle chassis. Moreover, had the Legislature desired to exclude the coach portion of motorhomes from the definition of "consumer goods," it could have specifically done so, as it did with clothing and consumables.

Our examination of the Act and its interrelation with the "Lemon Law" also convinces us that motorhome coaches are subject to the Act's provisions of general application, including section 1793.2, subdivision (d)(1).

---

authorized service and repair facility for correction of the problem that gave rise to the nonconformity. Nothing in this paragraph shall in any way limit the rights or remedies available to the buyer under any other law."

[8]The "Lemon Law" also sets forth a rebuttable presumption specifically for new motor vehicles with respect to the replace-or-refund provision of section 1793.2, subdivision (d)(2). Under the "Lemon Law's" rebuttable presumption, a reasonable number of attempts at repairs has been made when (1) the motor vehicle has been taken to the repair shop for the same problem within one year or 12,000 miles of purchase, whichever comes first, or (2) the vehicle has been out of commission for more than 30 days during the first year or 12,000 miles. (§ 1793.22, subd. (b).) Additionally, the "Lemon Law" provides for third party dispute resolution of motor vehicle warranty disputes. (§ 1793.22, subds. (c), (d).)

█ Broadly speaking, the Act regulates warranty terms; imposes service and repair obligations on manufacturers, distributors and retailers who make express warranties; requires disclosure of specified information in express warranties; and broadens a buyer's remedies to include costs, attorney fees and civil penalties. (§§ 1790-1795.8.)

From its inception almost a quarter of a century ago, the purpose of the Act has been to provide broad relief to purchasers of consumer goods with respect to warranties. (Stats. 1970, ch. 1333, p. 2478 et seq.; see Comment, *Toward An End to Consumer Frustration—Making the Song-Beverly Consumer Warranty Act Work* (1974) 14 Santa Clara Law. 575.) Since then, the Act has been amended numerous times. One of the most significant amendments occurred in 1982 when the Legislature, in response to the public's complaints about warranties affecting new motor vehicles, added the so-called "Lemon Law" to the Act. (Stats. 1982, ch. 388, § 1, pp. 1720-1723.) In effect, the "Lemon Law" provisions identified a special subcategory of consumer goods, namely "new motor vehicles," and attached distinct presumptions and rules to disputes involving express warranties on new motor vehicles. (See fn. 8, *ante.*) As a result, the "Lemon Law" augmented the relief afforded to dissatisfied consumers of new motor vehicles (*Ibrahim* v. *Ford Motor Co.,* *supra,* 214 Cal.App.3d at p. 884); it did not reduce or otherwise affect the rules applicable to other types of consumer goods.

Subsequently, when the Legislature further amended the Act by changing the "Lemon Law" definition of "new motor vehicles" to include the chassis portion of motorhomes while excluding the coach portion, the Legislature acted to expand consumer protections, not to diminish them. (Stats. 1988, ch. 697, § 1, p. 2319.)[9]

National offers a tortured statutory construction analysis to support its premise that motorhome coaches are exempt from the general replace-or-refund provision of the Act covering consumer goods (§ 1793.2, subd. (d)(1)). National argues that the "[e]xcept as provided in paragraph (2)" language of section 1793.2, subdivision (d)(1), incorporates the motorhome coach exemption of section 1793.22, subdivision (e)(2), since the exemption is referenced in paragraph (2).

This argument is unpersuasive. The "[e]xcept for" introductory clause of section 1793.2, subdivision (d)(1), clearly excludes motor vehicles, which

---

[9]The original "Lemon Law" specifically excluded motorhomes. (Stats. 1982, ch. 388, § 1, pp. 1720-1723.) The 1988 amendment legislation extending the "Lemon Law" protections to the chassis portion of motorhomes and excluding the coach portion of motorhomes is now codified at section 1793.22, subdivision (e)(2). (See fn. 5, *ante.*) Section 1793.22 is now the repository of the bulk of the "Lemon Law" provisions and is known as the Tanner Consumer Protection Act in honor of the author of the "Lemon Law," retired Assemblywoman Sally Tanner. (§ 1793.22, subd. (a).)

are to be covered by section 1793.2, subdivision (d)(2)—the more specific "Lemon Law" replace-or-refund provision. Section 1793.2, subdivision (d)(2), excludes motorhome coaches by specific reference to the definition of motor vehicle contained in section 1793.22, subdivision (e)(2). Section 1793.2, subdivision (d)(1), the Act's replace-or-refund provision of general application, neither explicitly nor implicitly incorporates the motorhome coach exemption. It simply covers all consumer goods other than new motor vehicles.

The result of National's proposed construction would be that motorhome coaches would be exempt from the replace-or-refund provisions of the Act—both the provision of general application and the specific provision for new motor vehicles. In other words, motorhome coaches would be treated differently from all other consumer goods that carry express warranties, rendering the express warranties that accompany these coaches largely meaningless. Such a result cannot be in keeping with the Legislature's intent.

"[T]he Act is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." (*Kwan* v. *Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184 [28 Cal.Rptr.2d 371].) Specifically, the Act was aimed at eliminating consumer frustration caused by defective products and easing some of the difficulties inherent in pursuing claims arising out of product warranty disputes. (See *Toward An End to Consumer Frustration—Making the Song-Beverly Consumer Warranty Act Work, op. cit., supra,* 14 Santa Clara Law. 575.) National has presented no good reason to exempt motorhome coaches from the Act; such exemption would diminish consumer protections and thereby contravene the purposes of the Act.

We also find it is somewhat ironic that National is using the motorhome coach exemption contained in the 1988 expansion of the "Lemon Law" (now codified at § 1793.22, subd. (e)(2)), which clearly was intended to expand consumer protections, as the basis for arguing that coaches covered by warranty are not subject to any replace-or-refund provision under the Act. It also is incorrect; the law exempts motorhome coaches from the specific provisions of the "Lemon Law," but not from the general provisions of the Act that apply to consumer goods.

■ Amicus RVIA offers a statutory construction argument based on the one-time inclusion of "mobilehome"[10] in the definition of "consumer goods" under the Act (see Stats. 1971, ch. 1523, § 2, p. 3001) and the subsequent deletion of "mobilehome" from the definition (see Stats. 1978, ch. 991, § 1, p. 3058).[11] RVIA argues the Legislature's deletion of "mobilehome" from the definition of "consumer goods" demonstrated an intent to do just that. We are not persuaded.

The 1978 amendment to section 1791, subdivision (a), served to enlarge the definition of "consumer goods" from an exclusive list of specific products and their like to an all-inclusive list, including "any new product . . . except clothing and consumables." (Stats. 1978, ch. 991, § 1, p. 3058.) This expansion of the definition of "consumer goods" is reflected in the following legislative committee analysis of the bill that carried the amendment (Assem. Bill No. 3374): "The products that fall under the regulations of the Song-Beverly Act are those products defined as 'consumer goods.' The present definition is restricted to predominantly mechanical type products and excludes such goods as furniture, phonograph records, tapes, picture frames and drapes. Due to the manner in which clothing and consumables are handled, it makes some sense to exempt such goods. Beyond that, the question must be raised as to why *any* good should be excluded; should not all products sold be required to perform in the manner intended? The definition of 'consumer goods' proposed by this piece of legislation would include all goods except clothing and consumables." (Assem. Com. on Labor, Employment & Consumer Affairs, Analysis of Assem. Bill No. 3374

---

[10]At the time, a motorhome could arguably be included in the definition of a "mobilehome." (See former § 1797.1 ["As used in this chapter, 'mobilehome' means a vehicle designed and equipped for human habitation and which may be drawn by a motor vehicle only under a permit issued pursuant to Section 35790 of the Vehicle Code and shall include in addition to the structure thereof the plumbing, heating and electrical systems and all appliances and other equipment installed or included therein by the manufacturer or dealer."] (Stats. 1971, ch. 1492, § 1, p. 2944).) This is no longer the case. (See fn. 12, *post.*)

[11]Under the Act, as originally enacted in 1970, "consumer goods" were defined as "any motor vehicle, machine, appliance, or like product that is used or bought for use primarily for personal, family, or household purposes." (Stats. 1970, ch. 1333, § 1, p. 2478.) This definition appeared in section 1791, subdivision (a).

In 1971, the Legislature amended section 1791, subdivision (a), to read: " 'Consumer goods' means any new mobilehome, motor vehicle, machine, appliance, like product, or part thereof that is used or bought for use primarily for personal, family or household purposes. 'Consumer goods' also means any new good or product, except for soft goods and consumables, the retail sale of which is accompanied by an express warranty to the retail buyer thereof and such product is used or bought for use primarily for personal, family, or household purposes. . . ." (Stats. 1971, ch. 1523, § 2, p. 3001.)

In 1978, the Legislature amended section 1791, subdivision (a), to read: " 'Consumer goods' means any new product or part thereof that is used or bought for use primarily for personal, family, or household purposes, except for clothing and consumables." (Stats. 1978, ch. 991, § 1, p. 3058.)

(1977-1978 Reg. Sess.) p. 2, italics in original.) ■ "Statements in legislative committee reports concerning the statutory objects and purposes which are in accord with a reasonable interpretation of the statute are legitimate aids in determining legislative intent." (*Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 24 Cal.3d 653, 659 [156 Cal.Rptr. 733, 596 P.2d 1149].)

Moreover, our conclusion that the Legislature's deletion of "mobilehome" in 1978 expanded the definition of "consumer goods" is consistent with the general policy of giving remedial measures, such as the Act, a construction calculated to bring its benefits into action. (*Kwan* v. *Mercedes-Benz of North America, Inc., supra,* 23 Cal.App.4th at p. 184.)

RVIA also argues it is unfair to include motorhome coaches in the Act because the coaches are subject to other regulatory laws. This is an apples-and-oranges argument without merit. The safety laws RVIA refers to (see, e.g., Health & Saf. Code, §§ 18010, 18015.5, 18025, 18027.3, 18028) require motorhomes to meet specified structural, electrical, plumbing and fire safety standards, including those set by the Department of Housing and Community Development. While these statutes may indeed protect consumers by assuring safety, they have nothing to do with consumer warranties, which are the subject of the Act.[12]

■ In sum, while it is clear that motorhome coaches are not covered by the so-called "Lemon Act," they clearly are "consumer goods" within the meaning of the Act and are subject to the general application provisions of the Act, such as section 1793.2, subdivision (d)(1).

II. *Substantial Evidence Supports Civil Penalty Under Act*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[12]We note there are specific laws outside of the Act dealing with mobilehome warranties, which require all new mobilehomes and manufactured homes to be covered by warranty. (See § 1797 et seq.) When these laws were enacted in 1971, the definition of "mobilehome" contained in section 1797.1 included a motorhome. (Stats. 1971, ch. 1492, § 1, p. 2944.) However, the definition was amended in 1982 and 1988 to apply only to mobilehomes and manufactured housing as defined by Health and Safety Code sections 18007 and 18008; these definitions exclude motorhomes. (See Stats. 1982, ch. 730, § 2, p. 2904; Stats. 1988, ch. 793, § 1, p. 2560.) Thus, motorhome coaches are no longer subject to the warranty provisions of section 1797 et seq.

\*See footnote 1, *ante*, page 1072.

## DISPOSITION

Affirmed.

Froehlich, Acting P. J., and Nares, J., concurred.