Filed 5/6/26; Certified for Publication 6/3/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRIAN PHILLIPS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>VOLVO PENTA OF THE<br>AMERICAS, LLC, et al.,<br><br>    Defendants and Respondents. | A170727<br><br>(Alameda County<br>Super. Ct. No. RG19038018) |

Brian Phillips appeals a summary judgment in favor of Volvo Penta of the Americas, LLC (Volvo), which manufactured and expressly warranted the engine of a boat Phillips bought. For reasons unknown, the engine repeatedly overheated, disabling the boat, which Phillips twice sent to an authorized Volvo service-and-repair facility. After the boat again overheated, Phillips sent it to the facility a third time. This time, they found a cracked manifold had allowed water to enter the engine, but Volvo declined at first to authorize warranty repairs, and Phillips sued under the Song–Beverly Consumer Warranty Act (the Act) (Civ. Code, § 1790 et seq.; statutory references are to this code unless otherwise designated). Eleven days later, before the relevant Volvo employees learned of the lawsuit, Volvo reversed its decision and agreed to replace the engine at no cost.

1

Phillips continued his lawsuit.  Noting that, if consumer goods do not conform to an express warranty, and a manufacturer fails after a reasonable number of attempts to repair them, the Act requires it to "replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer" (§ 1793.2, subd. (d)(1) (§ 1793.2(d)(1))), Phillips contended that Volvo's replacement of the component it had warranted—the engine—did not satisfy that duty: The relevant "good," he claims, is the boat *as a whole*, so Volvo must replace *the boat* or pay him its full price.  Phillips offered no evidence that the engine's overheating damaged any other part of the boat, and he cites no authority suggesting that the Act requires Volvo nonetheless to replace or "repurchase" the entire boat.  We affirm the judgment in Volvo's favor.

### OVERVIEW OF THE ACT

We first briefly set forth the framework of duties the Act imposes on "manufacturer[s] of consumer goods sold in this state and for which the manufacturer has made an express warranty" (§ 1793.2, subd. (a)), as well as the corresponding remedies it affords buyers of such goods.  For argument's sake, we assume that the boat and the engine both satisfy the Act's definition of "consumer goods" (§ 1791, subd. (a)),[1] and that Volvo comes within its definition of a "manufacturer" of such goods (*id.*, subd. (j)) based on its manufacture and express warranty of the engine and related parts.

A manufacturer of consumer goods sold in this state subject to express warranties must authorize sufficient service-and-repair facilities in this state to carry out those warranties.  (§ 1793.2, subd. (b).)  If a good's nonconformity

---

[1] Although it is a vehicle with a motor, Phillips's boat undisputedly is *not* subject to the distinct subset of provisions within the Act, commonly known as the Lemon Law, that apply to a "new motor vehicle"—a term defined to include only terrestrial conveyances.  (§ 1793.2, subd. (d)(2)).

2

with such a warranty necessitates repair, the buyer shall deliver the goods to such a facility. (*Id.*, subds. (b), (c).) If the facility "does not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer" (less the value of the buyer's use of the goods). (§ 1793.2(d)(1).)

The Act creates a cause of action for buyers: If a manufacturer fails to comply with its duties under the Act, a "buyer of consumer goods who is damaged by [the] failure . . . may bring an action for the recovery of damages and other legal and equitable relief." (§ 1794, subd. (a).) The measure of the buyer's damages "shall include the rights of replacement or reimbursement" set forth in the above-quoted section 1793.2(d)(1). (§ 1794, subd. (b).[2])

### FACTUAL AND PROCEDURAL BACKGROUND

In June 2018, Larson Marine, Inc. (Larson) sold Phillips a Bennington brand boat with a power package (engine and related parts) manufactured by Volvo. Larson is an authorized dealer of Bennington brand boats manufactured by Polaris Industries, Inc. (a successor to Bennington). Phillips's sales contract with Larson identified the boat as comprising the Bennington boat, Volvo power package, and a pontoon. Phillips paid one price for the boat comprising those components; he did not pay a distinct price for the Volvo engine.

Volvo—which sells leisure-use marine engines only to boat builders, not at retail to end customers—manufactured the "power package" at issue and sold it to Polaris, which then incorporated it in the boat. Volvo sold the power package with a Marine Gasoline Engine and Power Package Limited

---

[2] Damages in an action under section 1794 can also include other elements on which Phillips does not rely on appeal. (§ 1794, subd. (b).)

Warranty (the warranty). Polaris separately provided Phillips an express stem-to-stern warranty for the entire boat.[3]

Volvo's warranty states as follows: "[Volvo] warrants that new, marine gasoline power packages will be free from defects in material or workmanship for a period of two years or 480 hours, whichever occurs first. This two-year warranty is limited to complete power packages (engine, transom shield, sterndrive, IPS, Volvo Penta branded marine transmissions, jackshafts, and engine accessories) in leisure-use" (a term defined in a way undisputedly including Phillips's power package). The warranty directs a warrantee to present the boat for service or repairs to a "Volvo Penta authorized dealer," and it promises "[a]ny part of the Volvo Penta engine or power package that is covered by this warranty and that is found in the reasonable judgment of Volvo Penta to be defective in materials or workmanship will be repaired or replaced at Volvo Penta's option." Larson is an authorized repair facility for Bennington boats made by Polaris; Helmut's Marine Service, Inc. (Helmut's) is an authorized service-and-repair center for Volvo engines.

Two weeks after Phillips got the boat, it began sporadically to overheat, which on the first three occasions required him to restart the boat, and on the last two left it unable to start, requiring him to have it towed. On all five occasions, spanning July 2018 to August 2019, he initially took the boat (or had it towed) to Larson for repairs.

---

[3] At oral argument, Phillips's counsel represented that Polaris's warranty had a "carveout" for, and did not cover, the power package. But in the separate statement of undisputed material facts supporting its summary judgment motion, Volvo quoted Phillips's operative complaint as alleging that Polaris's warranty " 'expressly provided "ste[m] to stern coverage," and was not limited to specified components,' " and Phillips deemed that fact "Undisputed." ~(AA 436)~

The first two times, both in July 2018, Larson alone worked on the boat, without lastingly resolving the problem.

The third time, in February 2019, Phillips took the boat to Larson for several concerns that, according to his deposition, included an overheating incident. Larson created an invoice that it left "open" until July 2019, so that the invoice came to reflect work on multiple occasions. In June 2019, as shown on this invoice, Larson sent the boat to Helmut's for work that included fixing its "tow mode" (a feature analogous to cruise control that ensures a steady speed for activities like waterskiing). Helmut's created an invoice in June 2019 that does not reflect any attempt to address the overheating problem, and it is unclear whether anyone told Helmut's at the time about the overheating problem.

The fourth time, in July 2019, the boat would not restart after overheating, so Phillips had it towed to Larson, who could not fix it. Larson sent the boat to Helmut's, where a technician noticed problems with the coolant level and bilge pump, fixed them, test-drove the boat without it overheating, and returned it to Larson.

On the final occasion, in August 2019, the boat also would not restart after overheating, so Phillips had it towed to Larson, who sent it to Helmut's. The same technician rediagnosed the engine, this time finding that water had entered the cylinders through a crack in the exhaust manifold (a part of the engine).

On September 4, Helmut's made a warranty claim to Volvo, which responded by expressing doubt that the problem fell within its warranty, reasoning that if the cracked manifold reflected a defect in material or workmanship, the problem would have manifested sooner. On September 5, Helmut's employee Nadine Urciuoli told Phillips of Volvo's response. Phillips

replied that he had brought the boat in for overheating several times, and Urciuoli requested copies of the repair invoices, which Larson sent her on September 6. On September 10, Urciuoli emailed Phillips that Volvo had declined the warranty claim. Later that day, she emailed Volvo the service records Larson had provided and advised it that Larson might reach out to it about the claim.

On October 1, Larson submitted a warranty claim to Volvo. On October 2, a Volvo employee asked Larson to send the cracked exhaust manifold, attaching a FedEx label, and added, "I have created [a case number] to further the engine replacement."

On October 4, Phillips filed suit against Volvo, Polaris, and Larson. On October 8, he served the complaint on Volvo.

On October 16, Larson emailed Phillips that Volvo would ship a "new engine" for Helmut's to install, and "All covered under warranty." Phillips replied, "That is awesome news!" No Volvo employee involved in evaluating and ultimately approving the warranty claim had known of Phillips having filed or contemplated a lawsuit.

Helmut's installed the new engine and successfully sea-trialed the boat. Phillips took possession of the boat but has not used it since, as he is " 'not comfortable' " doing so given its past failures.

Phillips's operative complaint included, as relevant here, a cause of action for Volvo's breach of its asserted duty under the Act to repurchase the boat after having failed, following a reasonable number of attempts, to service or repair the boat to conform to Volvo's express warranty.[4] Volvo moved for

---

[4] Phillips also pled a cause of action for breach of implied warranties, but he does not challenge the summary adjudication of that cause of action, expressly limiting his appeal to his cause of action for a violation of the Act related to the express warranty.

6

summary judgment. In granting the motion, the trial court reasoned that Phillips had not offered evidence creating a triable factual dispute whether he suffered any damages beyond the defective engine Volvo replaced. He had not offered any evidence, the court noted in particular, either that the boat remained prone to overheat after the engine replacement, or that past overheating had damaged any part of the boat other than the engine.

## DISCUSSION

Summary judgment is proper if the papers and affidavits, together with " 'all inferences reasonably deducible from the evidence' and uncontradicted by other inferences or evidence, show 'there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (*Marez v. Lyft, Inc.* (2020) 48 Cal.App.5th 569, 576; Code Civ. Proc., § 437c, subd. (c).) A defendant can make this showing "by proving one or more elements of the cause of action cannot be established." (*Marez*, at p. 576.) If a defendant bears that burden, "the burden shifts to the plaintiff to show the existence of a triable issue of material fact as to that cause of action." (*Id.* at pp. 576–577.) We review the trial court's ruling de novo. (*Id.* at p. 576.)

The ultimate question in this appeal is whether the trial court erred in ruling that Volvo had established, beyond triable factual dispute, that Phillips cannot prove the damages element of his cause of action under section 1794. (See § 1794, subd. (a) ["Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter . . . may bring an action for the recovery of damages and other legal and equitable relief"].)[5]

---

[5] Phillips quotes a decision requiring a buyer suing under the Act to prove these elements: "(1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable

7

Although Phillips's briefs raise many issues—some related to that question, and some not—whether he suffered damages cognizable under the Act boils down to one issue:  Did Volvo's issuance of an express warranty for the power package obligate Volvo, if it was unable after a reasonable number of attempts to bring the power package into conformity with its warranty, to replace—or pay Phillips an amount equal to the purchase price of—not just its power package, but the entire boat?  (§ 1793.2(d)(1).)  We agree with Volvo and the trial court that Phillips has not shown that the Act imposed such a duty on Volvo.[6]

"The [Act] was enacted to address the difficulties faced by consumers in enforcing express warranties.  Consumers frequently were frustrated by the inconvenience of having to return goods to the manufacturer for repairs and by repeated unsuccessful attempts to remedy the problem.  [Citation.]  The Act protects purchasers of consumer goods by . . . providing mechanisms to

_____

number of repair attempts."  (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 798–799.)  He also cites a form jury instruction listing more detailed "essential factual elements" of a cause of action under section 1794, which does not list damages as an element. (Judicial Council of Cal. Civil Jury Instruction No. 3200, capitalization omitted.)  But section 1794 creates the cause of action, and its text unambiguously authorizes suit by "Any buyer of consumer goods *who is damaged* by a failure to comply with any obligation under this chapter . . . ." (§ 1794, subd. (a), italics added.)  Phillips has not developed an argument that he can pursue a cause of action if he has no damages cognizable under the Act, or that the trial court erred in treating damages as an element of his cause of action.

[6] We thus need not address Phillips's contentions that (1) there are triable factual disputes material to whether (a) the power package conformed to Volvo's warranty and (b) Volvo had a reasonable number of chances to repair it; (2) Phillips did not need to deliver the boat to or communicate with Volvo, as opposed to its authorized service facility; and (3) he did not need to prove the cause of the overheating.

ensure that manufacturers live up to the terms of any express warranty." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 484.) As a remedial measure to protect buyers, the Act "should be given a construction calculated to bring its benefits into action." (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990.) While the Act limits manufacturers' ability to disclaim *implied* warranties, it does not require them to issue express warranties. (*Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318, 1330 (*Mega RV*).) In particular, the Act does not require the manufacturer of a component included in a consumer good to issue an express warranty, nor does it dictate the substantive scope of any such warranty a component manufacturer may choose to issue. (§ 1793.)

Phillips nonetheless contends that if the manufacturer of a component integrated in a consumer good issues an express warranty covering only the component it manufactured, the Act obliges the manufacturer to replace the entire consumer good, or else pay the customer the purchase price of that good, unless the manufacturer is able, in a reasonable number of attempts, to resolve any problem in the good that its component *might* have caused. To analyze his position, we first review the text and structure of section 1793.2 and then the trio of decisions Phillips cites. Neither supports his view.

*1. The Statute's Text and Structure Do Not Support Phillips's View*

The statutory text is most naturally read to impose on a manufacturer of consumer goods a service-and-repair duty—and replace-or-pay liability—that is limited to the goods the manufacturer sold and warranted. We reach this conclusion based on a commonsense principle of statutory interpretation: " 'when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute.' " (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1125.) In particular,

9

we presume that the Legislature intended the terms "the goods" and "express warranties" as used in section 1793.2(d)(1) to refer to the same "goods" and "express warrant[ies]" as are discussed in earlier subdivisions of section 1793.2.

The structure of section 1793.2 is simple. It begins with a triggering provision: "(a) Every manufacturer of consumer *goods* sold in this state and for which the manufacturer has made an *express warranty* shall . . . ." (§ 1793.2, subd. (a), italics added.) Section 1793.2 then sets forth a series of duties any such manufacturer must discharge, starting with the obligation that it maintain or authorize service-and-repair facilities "where *its consumer goods* are sold to carry out the terms of *those warranties*." (*Id.*, subd. (a)(1)(A), italics added.) The statute goes on to require the manufacturer or its authorized representative, if "service or repair of *the goods* is necessary because they do not conform with *the applicable express warranties*," promptly to begin and complete those repairs. (*Id.*, subd. (b), italics added.) Reading this far, we have no doubt that the terms like "the goods" and "applicable express warranties" all refer to the *same* "goods" and "express warranties" to which subdivision (a) refers as having triggered a manufacturer's duties under the statute. (See also § 1793.2, subd. (c) [manufacturer must "service or repair the goods"].)

That brings us to section 1793.2(d)(1), which Volvo allegedly breached. It states that "if the manufacturer or its representative . . . does not service or repair *the goods* to conform to *the applicable express warranties* after a reasonable number of attempts, the manufacturer shall either replace *the goods* or reimburse the buyer in an amount equal to the purchase price paid by the buyer," less the value of the buyer's use of the goods. (§ 1793.2(d)(1), italics added.) As above, we have no doubt that "the goods" and "the

10

applicable express warranties" to which subdivision (d)(1) refers in setting the scope of a manufacturer's liability for breaching its duty to service and repair are the same "goods" and "express warranty" to which subdivision (a) refers in describing the conduct that triggers the duty. It follows that "the purchase price paid by the buyer" is the purchase price paid for "the goods" sold and expressly warranted *by the manufacturer*. (*Id*., subd. (d)(1).)

Here, "the goods" that Volvo "sold in this state and for which [it] has made an express warranty" (§ 1793.2, subd. (a)) are the power package, not the entire boat in which Polaris incorporated that package. It was Polaris who sold and warranted the boat as a whole. We agree with Volvo that the only sound reading of subdivision (d)(1) is that "the goods" Volvo was obliged either to service and repair to conform to "the applicable express warranties," or else replace or reimburse the purchase price thereof, are the "goods" that Volvo itself sold and made subject to an "express warranty," as those terms are used in subdivision (a).

While Phillips urges us to treat "the goods" and the "purchase price paid by the buyer" identified in section 1793.2 (d)(1) as the entire boat and the full price thereof, he offers no logical basis for decoupling the scope of Volvo's potential liability for breach of its duty to service and repair from the scope of the commercial conduct by which Volvo undertook that duty. He notes that the price he paid under his purchase agreement with Larson was for the boat as a unit, with no distinct price for the engine, but he does not explain why he and Larson should be able, by deciding how to structure or label *their* transaction, qualitatively to enlarge the scope of the statutorily mandated duties and potential liability Volvo undertook when it chose to sell and expressly warrant specific goods (i.e., the power package). That would be the effect of construing "the goods" to mean something broader in

11

subdivision (d)(1) (i.e., the entire boat) than the same words mean in section 1793.2, subdivision (a) (i.e., the power package Volvo sold and warranted). So construed, the statute would give Volvo no warning that, by choosing expressly to warrant and sell to Polaris a power package triggering subdivision (a), it would expose itself to liability under subdivision (d)(1) measured, not by the value of the package, but by the total value of whatever boat Polaris might choose to incorporate it in.

We thus conclude that subdivisions (a) and (d)(1) of section 1793.2, read together, mean that if a "manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty" (§ 1793.2, subd. (a)) fails adequately to "service or repair the goods to conform to the applicable express warranties," then the manufacturer must "either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer" for those goods (§ 1793.2(d)(1)). Phillips identifies no reason to think that the Legislature instead intended subdivision (d)(1) to require a manufacturer to replace, or reimburse the price paid for, goods sold and expressly warranted only by other manufacturers.[7]

*2. The Decisions Phillips Cites Undermine His Position Or Are Irrelevant.*

For his contrary reading of the statute, Phillips cites authority that on close inspection does not support his position.

In *Mega RV*, *supra*, 225 Cal.App.4th 1318, the Fourth District examined the Act's history and policy to assess whether section 1792 applies to component-part manufacturers as well as the ultimate manufacturer of a consumer good. (*Mega RV*, at p. 1328.) Section 1792, a part of the Act not at

---

[7] Although Phillips did not pay a distinct line-item price for the power package, he does not contend that identifying that portion of the boat's price attributable to the power package, were it necessary to do so, would exceed the factfinding capabilities of a court or jury aided by expert testimony.

issue here, governs implied warranties as well as indemnity between sellers and manufacturers. The court concluded that component-part manufacturers that provide express warranties to the buyer are subject to the Act. (*Id.* at p. 1335.) *Mega RV* thus establishes the uncontroversial point that a component-part manufacturer like Volvo who issues an express warranty to a buyer like Phillips is subject to the Act. (*Ibid.*) We agree with Phillips—at least for purposes of this appeal—that Volvo must therefore maintain or authorize repair facilities in California (§ 1793.2, subd. (a)), and must replace or reimburse the price of "the goods" if it is unable to make them conform to its warranty after a reasonable number of attempts (*id.*, subd. (d)(1)). But *Mega RV* did not address the question we now face: Are "the goods" that such a component manufacturer must replace or reimburse the price of (1) those that the manufacturer itself made and warranted, as Volvo contends, or (2) the entire consumer good that incorporates the manufacturer's product as a component, as Phillips contends?

While the *Mega RV* court did not resolve that question, its analysis includes dicta strongly suggesting it would have resolved the issue in Volvo's favor. (See *Mega RV*, *supra*, 225 Cal.App.4th at p. 1335.) We explain why below.

*Mega RV* involved an indemnification dispute between the retail seller of a recreational vehicle (RV) and a company called HWH that made hydraulic parts included in the RV. (*Mega RV*, *supra*, 225 Cal.App.4th at p. 1322.) After the buyers sued the dealer and the RV maker that had incorporated HWH's products in its product, the RV maker went bankrupt. (*Id.* at p. 1322.) The dealer, deprived of its expected defense and indemnification, brought HWH into the action by filing a cross-complaint for indemnity under section 1792. (*Mega RV*, at p. 1322.) That section states that, if not

13

disclaimed, any retail sale of consumer goods in California "shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable," and it gives the retailer "a right of indemnity against the manufacturer in the amount of any liability under this section." (§ 1792.) The trial court in *Mega RV* held that HWH did not have to indemnify the RV dealer because HWH (unlike Volvo here) had given no express warranty to the RV's buyer. (*Mega RV*, at pp. 1322–1323, 1327.)

Affirming, the Fourth District held that section 1792 applies to a component manufacturer if, but only if, the component manufacturer gives an express warranty to the buyer of the consumer good. (*Mega RV*, *supra*, 225 Cal.App.4th at pp. 1327–1335.) "By requiring an implied warranty of merchantability to accompany any express warranties," the court explained, "the Act ensures that retail buyers in receipt of an express warranty have a minimum level of substantive protection." (*Mega RV*, at p. 1331.) Thus, a nondisclaimable "implied warranty of merchantability accompanies any express warranty provided by a component-part manufacturer to a retail buyer." (*Id.* at pp. 1334–1335.) From that fact, "it follows that a retail seller has a right to indemnity from the component-part manufacturer." (*Id.* at p. 1335.)

The court then made the following comments in dicta: "Just as *the scope of the express warranty provided by a component manufacturer would undoubtedly be limited to the component part at issue*, the implied warranty of merchantability (and accompanying retail seller's right to indemnification) would likewise be adapted to the scope of the 'part' provided by the component-part manufacturer." (*Mega RV*, *supra*, 225 Cal.App.4th at p. 1335,

14

italics added.)[8] Volvo unsurprisingly quotes this language, reasoning: If a component manufacturer who issues an express warranty does not thereby oblige itself to indemnify a retailer for the full price of a consumer good in which its product is incorporated, but only for the price of its own product, that manufacturer should not be liable *to the buyer* for the full price of the larger consumer good. In reply, Phillips points out the comment is dicta but does not dispute that the *Mega RV* court seemingly would have treated the *scope* of Volvo's express warranty as "limited to the component part at issue" (i.e., the power package), not the entire boat in which Polaris incorporated that package. (*Mega RV*, at p. 1335.)

Another decision on which Phillips relies, *Tiffin Motorhomes, Inc. v. Superior Court* (2011) 202 Cal.App.4th 24 (*Tiffin*), is even less helpful to him. In *Tiffin*, the buyers of an RV with "vaguely described defects that were never satisfactorily repaired" sued the makers of its engine (Cummins), chassis (Freightliner), and coach (Tiffin). (*Id.* at pp. 27–28.) After Cummins settled with the buyers, it moved under Code of Civil Procedure section 877.6 for a determination of the settlement's good faith so as to bar indemnity claims. (*Tiffin*, at p. 28.) The Fourth District addressed whether section 877.6 applies as between multiple manufacturers sued on separate express warranties, each issued for distinct components of a product. (*Tiffin*, at p. 29.) Noting that the good-faith-settlement statute applies if " 'it is alleged that two or more parties are joint tortfeasors or *co-obligors on a contract debt*' " (*ibid.*, quoting Code Civ. Proc., § 877.6, subd. (a)(1), italics added), the court held that the latter phrase applies only to co-obligors on the *same* contract, not on *separate* contracts like the separate warranties at issue

---

[8] The comment was dictum because HWH had *not* given the RV buyers any express warranty whose scope could thus require determination.

15

(*Tiffin*, at pp. 29–30).  The court cited the Song–Beverly Act only once, and briefly.  (*Tiffin*, at p. 28, fn. 6.)

In dicta, however, the court noted its assumptions about the component manufacturers' respective potential liabilities, and again, these comments do not assist Phillips.  (*Tiffin, supra*, 202 Cal.App.4th at p. 32).  Emphasizing the lack of tort claims or tort damages, the *Tiffin* court stated:  "Tiffin and Cummins owed separate duties to plaintiffs and the remedies for the breaches *would be separately calculable.  It is apparent that damages owed by Cummins due to an arguably defective engine would be distinct from those caused by defects to the coach attributable to Tiffin.*"  (*Ibid.*, italics added.) And later, "Where defendants are not obligors on the same contract, their obligations to the plaintiffs may differ; they will not necessarily (and in fact will rarely) have caused the same harm to the plaintiffs.  Each will, however, be liable for the contract damages stemming from the breach of the contract into which that defendant entered.  These obligations are neither 'joint' nor 'joint and several' and, therefore, do not give rise to any right of contribution [citation] because no defendant can be ordered to pay more than the amount of damages attributable to its own breach."  (*Id.* at p. 33.)

Phillips contends that Volvo's issuance of an express warranty for the power package exposed it to the *same* potential liability under the Act as Polaris's issuance of a stem-to-stern warranty for the entire boat—i.e., the purchase price of the entire boat.  But the premise of the *Tiffin* court's comments was that component manufacturers would each be liable only for damages attributable to their own breach of the express warranty they issued for their own product—liabilities that are "separately calculable," "distinct," and not "joint" or otherwise subject to a right of contribution.  (*Tiffin, supra,*

16

202 Cal.App.4th at pp. 32–33.) While the *Tiffin* court did not analyze the Song–Beverly Act, its assumptions thus support Volvo's position.

The final decision Phillips cites, *National R.V., Inc. v. Foreman* (1995) 34 Cal.App.4th 1072 (*Foreman*), may be the least helpful of all. The opinion begins, "This case presents the issue whether the coach portion of a motorhome is subject to the provisions of [the Act]" (*id.* at p. 1074), and that is indeed the only issue it considers. The Foremans sued the makers of separate portions of their defective RV: the coach (National) and chassis (General Motors (GM)). (*Id.* at p. 1075.) As to each, a jury found that the product did not conform to its respective warranty, that the defendant had failed after a reasonable number of attempts to repair it, causing damage, and that its violation of the Act had been willful, warranting a penalty. (*Foreman*, at p. 1076 & fns. 3–4.) But then GM settled out of the case and was not a party to the appeal. (*Id.* at p. 1076, fn. 3.) Only National appealed, so the opinion's Discussion section addresses *only* the issue National raised, i.e., "*Does Song–Beverly Apply to Motorhome Coaches?*" (*Id.* at pp. 1076– 1083.) The Discussion never mentions GM, even in dicta—let alone whether it could have been liable for damages based on the price of the entire motorhome, rather than just the chassis that it made and warranted. It appears the *Foreman* court noted the resolution of the claims against GM—in its factual background, not its legal discussion—only to avoid confusion as to why GM was not a party on appeal.[9]

---

[9] While never stating the *amounts* of damages awarded, the opinion in *Foreman* notes that the jury awarded a penalty against National three times larger than that against GM. (*Foreman*, *supra*, 34 Cal.App.4th at p. 1076, fn. 4 [$115,200 vs. $38,400].) Because the Act authorizes a penalty based on the size of a damages award (§ 1794, subd. (c) [penalty "shall not exceed two times the amount of actual damages"]), these disparate penalty awards

17

3. *Phillips's Other Comments About Damages Show No Error.*

Phillips thus fails in his core argument as to why the trial court erred in basing summary judgment on his inability to prove damages; he has not established the legal proposition that, as his brief puts it, his "damages for the express warranty claim [are] simply the actual price paid or payable for the boat." But portions of his brief make other arguments about how he might be entitled to a measure of damages even after the replacement of the engine. Primary among these, Phillips notes that Helmut's never identified the root cause of the overheating, and that he has not felt comfortable using the boat since Helmut's replaced the engine. On this basis he claims "there are serious questions of fact as to the extent of the defects that may still exist within the boat, including the undiagnosed overheating concern [and] possible damage to other components due to the repeated overheating."

As a factual predicate for this argument, Phillips cites two snippets of evidence: (1) a brief passage from the deposition of Helmut's technician Francis, in which the technician described how he found water in the cylinders that was preventing the engine from starting and the crack in the exhaust manifold that had let the water in, but never mentioned the overheating issue, and (2) a passage from a Volvo warranty manager's declaration stating that, despite investigating the manifold crack, Volvo " 'was unable to make any conclusive determination' " as to whether it was the result of a defect in materials or workmanship, overheating due to a problem elsewhere in the boat, or misuse by the customer.

The trial court rightly dismissed as speculative any claim to damages based on this evidence. Faced with the undisputed fact that Volvo replaced

---

suggest that the jury did *not* find each defendant liable for the same amount of damages, i.e., the full purchase price of the RV.

the engine—negating the main form of damages to which a failure to timely repair might entitle him (§§ 1793.2(d)(1), 1794, subd. (b))—Phillips could not avoid summary judgment merely by asserting that Volvo had not conclusively disproven every conceivable type of damages.  If Phillips believed that Volvo was not entitled to judgment because he can prove a form of damages *other than* "the rights of replacement or reimbursement as set forth in [§ 1793.2(d)(1)]" (§ 1794, subd. (b)), it was his burden to submit admissible evidence sufficient to create a triable factual dispute as to such damages. (*Bowen v. Burns & McDonnell Engineering Co., Inc.* (2024) 103 Cal.App.5th 759, 769.)  But as the trial court noted, in an observation unrefuted on appeal, Phillips cited no evidence sufficient to raise a triable factual dispute as to whether the boat still overheats at all—let alone because of a problem to which a defect in Volvo's power package causally contributes—and no evidence that its past overheating damaged any component of the boat that Volvo did *not* replace.[10]  Because Phillips, as the plaintiff, has the burden to prove all elements of his claim, including damages, this absence of evidence is fatal to his case.

Finally, in his reply brief, Phillips contends for the first time that Volvo's replacement of *the engine* did not constitute a replacement of the product Volvo sold and warranted, as required by section 1793.2(d)(1),

---

[10] Phillips cites *Robertson v. Fleetwood Travel Trailers of California, Inc.*, *supra*, 144 Cal.App.4th at page 800, but it is inapt.  The *Robertson* court upheld a judgment for the plaintiffs because, although the authorized service-and-repair facility for the manufacturer of their travel trailer eventually identified and replaced a defective part in the shower that caused a leak, its unreasonable failure to identify the problem earlier resulted in long-term water damage to the rest of the trailer.  (*Id.* at pp. 799–800; see *id.* at p. 801.)  Here, Phillips offered no evidence raising a triable factual dispute as to any analogous damage the overheating might have caused to any component of his boat but the engine.

because that product was a *power package* including other, related parts. "[W]e do not consider points raised for the first time in the reply brief absent a showing of good cause for the failure to present them earlier." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Phillips's reply brief does not acknowledge that this argument is newly raised, let alone show good cause for not having raised it in the opening brief, so that Volvo could have addressed it in its response brief. Given the technical nature of this argument, and the absence of any evidence that the overheating problem had anything to do with an unspecified, unreplaced component in the power package, we decline to depart from our usual practice and address this belatedly raised argument.

## DISPOSITION

The judgment is affirmed. Volvo shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Phillips v. Volvo Penta of the Americas, LLC, et al.* (A170727)

20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRIAN PHILLIPS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>VOLVO PENTA OF THE AMERICAS, LLC, et al.,<br><br>    Defendants and Respondents. | A170727<br><br>(Alameda County<br>Super. Ct. No. RG19038018) |

**ORDER CERTIFYING OPINION FOR PUBLICATION**
**[NO CHANGE IN JUDGMENT]**

**THE COURT***:

The opinion in this appeal, filed on May 6, 2026, was not certified for publication in the Official Reports. For good cause appearing, pursuant to California Rules of Court, rule 8.1105(b) and (c), the opinion is certified for publication. Accordingly, Volvo Penta of the Americas, LLC's request for publication is GRANTED.

The order effects no change in the judgment.

Dated: _____June 3, 2026_____          _____TUCHER, P.J._____
                                                                    Presiding Justice

_____

* Tucher, P.J., Fujisaki, J., and Petrou, J. participated in the decision.

1

Trial Court:        Alameda County Superior Court

Trial Judge:        Hon. Keith Kern Fong

Counsel:            Bickel Sannipoli APC, Brian J. Bickel and Jordan K.
                      Sannipoli for Plaintiff and Appellant

                    Lewis Brisbois Bisgaard & Smith, Jordan R. Fisher,
                      Anthony E. Sonnett, and Jocelyn A. Julian for
                      Defendant and Respondent Volvo Penta of the Americas,
                      LLC

*Phillips v. Volvo Penta of the Americas, LLC, et al.* (A170727)

2